REVISED SEPTEMBER 3, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-60696

———

In Re: In the Matter of the Complaint of SIGNAL INTERNATIONAL LLC,
Petition for Exoneration from or Limitation of Liability


v.

MISSISSIPPI DEPARTMENT OF TRANSPORTATION

                    Counter Claimant - Appellant - Cross - Appellee

v.

SIGNAL INTERNATIONAL LLC, Petitioning for Exoneration From or
Limitation of Liability

                    Cross Defendant - Appellee - Cross - Appellant

———

Appeal from the United States District Court
for the Southern District of Mississippi

———

Before JONES, Chief Judge, and KING and ELROD, Circuit Judges.

KING, Circuit Judge:

During Hurricane Katrina, two vessels owned by Signal International,
LLC broke from their moorings on the Pascagoula River, Mississippi, and allided
with and damaged a bridge of Interstate 10 approximately five miles away.
Thereafter, Signal International brought this petition seeking exoneration from

or limitation of liability for the allision. The Mississippi Department of Transportation, which had repaired the bridge, opposed the petition. The district court held that Signal International was not entitled to exoneration from but was entitled to limitation of its liability. The court then entered limited judgment in favor of the Mississippi Department of Transportation. Signal International now appeals the district court's denial of exoneration and its antecedent holding that Signal International failed to timely challenge the Mississippi Department of Transportation's status as a real party in interest. The Mississippi Department of Transportation appeals the district court's grant of limitation of liability and its failure to award prejudgment interest. For the following reasons, we affirm the district court's holding that Signal International waived its real party in interest defense, its finding that Signal International was not entitled to exoneration, and its finding that Signal International was entitled to limitation of its liability. We vacate the district court's judgment to the extent that it omitted an award of prejudgment interest for a portion of the time that elapsed prior to entry of judgment, as discussed herein. We therefore remand for calculation of prejudgment interest and entry of a modified judgment including that interest.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Signal International, LLC ("Signal") is a marine fabrication and repair company. It owns two facilities in Pascagoula, Mississippi, which sits on the Mississippi Sound, north of the Gulf of Mexico.[1] In August 2005, it owned and

---

[1] The two facilities are the East Yard, located on the Bayou Casotte, and the West Yard, located on the Pascagoula River's east branch.

operated two ringer crane barges,[2] the D/B Mr. T and the D/B Miss Tiff, and one smaller, steel deck barge, the D/B Jack King.[3] During Hurricane Katrina, the Miss Tiff and the Jack King broke from their moorings on the east branch of the Pascagoula River and allided[4] with a bridge of Interstate 10 approximately 4.7 miles away. Although the federal government owns the bridge, the Mississippi Department of Transportation ("MDOT") serves as a trustee and proprietor that is responsible for maintaining and repairing the bridge, and quickly undertook to repair it. Signal brought this petition seeking exoneration from or limitation of liability for the allision. MDOT opposed the petition. On March 24, 2008, the district court held a trial without a jury pursuant to Rule 52 of the Federal Rules of Civil Procedure. During that trial, the following facts were presented.

Hurricane Katrina approached the Gulf Coast in late August 2005. In order to monitor anticipated weather conditions at its facilities, Signal contracted with ImpactWeather to receive frequent, site-specific weather reports. On August 23, 2005, ImpactWeather began issuing weather advisories related to Tropical Depression Twelve, which eventually developed into Hurricane Katrina. On August 26, after Hurricane Katrina passed over the Florida peninsula and entered the Gulf of Mexico, ImpactWeather issued Advisory 14, which reported that some models were predicting that the hurricane could strike

---

[2] Ringer crane barges are platform vessels that support large, fixed cranes. Signal uses them to facilitate work on the off-shore side of rigs that are under construction or repair.

[3] Signal had previously employed the Jack King as a ringer crane barge but converted it to a steel deck barge after the other ringer crane barges came into service.

[4] "'An allision is a collision between a moving vessel and a stationary object.'" Mid-South Towing Co. v. Exmar Lux (In re Mid-South Towing Co.), 418 F.3d 526, 528 n.1 (5th Cir. 2005) (quoting THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 14-2 (4th ed. 2004)).

Mississippi late on August 28 or early on August 29 with hurricane-force winds possible in Pascagoula.[5]

At that time, Signal had a written hurricane plan to secure its facilities and vessels in the event of an approaching storm. Ronald W. Schnoor, Signal's senior vice president and general manager of its Mississippi operation, was responsible for Signal's hurricane preparations in Pascagoula and approved the plan. Among the other components of the plan, Signal was to monitor approaching hurricanes and hold a meeting to discuss preparation of its facilities, property, and equipment when there was the possibility of a hurricane strike within seventy-two hours (the "seventy-two hour meeting"). Once the plan was set in motion, Signal crews were, among other tasks, to use ringer crane barges to secure the rigs, vessels, and objects in the facilities. The crews were then to prepare the ringer crane barges for transit to the mooring site by removing the crane booms because, during high winds, the booms function like large sails and could cause the barges to strike other objects. After preparing the ringer crane barges, the crews were to move them upriver and moor them "with the barge spuds, or other suitable moorings."[6]

After receiving the Advisory 14 on August 26, Signal held its seventy-two hour meeting. At the completion of that meeting, Signal braced its Pascagoula

---

[5] By 3:00 a.m. on August 27, however, an ImpactWeather report predicted that Pascagoula would be subject only to below-hurricane conditions: fifty-eight miles-per-hour winds and six-feet storm surges. Nonetheless, Hurricane Katrina was still expected to strike Louisiana as a Category 4 hurricane.

[6] Barge spuds are eighty-to-ninety-feet-long pipes that are dropped through wells in the barges. Weighing eight to ten tons each, the barge spuds penetrate the bottom of the river bed to a depth of approximately ten feet, effectively mooring the barges in place. Although not specified in the plan, other suitable moorings might include anchors, wire rope, or nylon rope, depending on the mooring site and expected conditions.

facilities for a Category 4 hurricane. Category 4 hurricanes pack maximum sustained winds of 155 miles per hour and maximum storm surges of eighteen feet. As part of Signal's preparations, its rigging crews used the ringer crane barges to secure the rigs in Signal's yard. At the time, the Miss Tiff's spud motor, which was used to lift the barge spuds, was inoperable and had been for several weeks. In the yard, the crews were able to use the Miss Tiff's ringer crane to raise and drop the barge spuds; however, because they needed to remove its boom to prepare the Miss Tiff for transit to the mooring site, the ringer crane was unavailable for use. Undeterred, Signal's rigging crew drove a smaller crawler crane onto the deck of the Jack King to facilitate the use of barge spuds to moor the Miss Tiff. Although the Jack King would not typically accompany the ringer crane barges to the mooring site, on this occasion, the crews tied the Jack King to the Miss Tiff, used the crawler crane to partially raise the Miss Tiff's barge spuds, and sent the flotilla up the Pascagoula River to the mooring site. On the initial journey, the Miss Tiff's spuds caught on a fiberoptic cable that should have been buried deeper into the riverbed. William L. Tanner, Signal's rigging department manager, reported the problem to William D. Bingle, Jr., Signal's production manager, who was in charge of implementing the hurricane plan. Bingle ordered that the spuds should be removed and that the Miss Tiff should be moored at the mooring site without them. The crews took the Miss Tiff back to Signal's West Yard and removed the spuds. At that time, Tanner developed a plan to tie the Miss Tiff and the Jack King to the Mr. T using nylon rope and instructed the rigging crews on his plan. He did not consult with Signal's engineering department to determine if the mooring arrangement would work.

The mooring site was an isolated portion of the east branch of the Pascagoula River sheltered by marshland and a ridge covered with trees. It is located about 2.5 miles north of the Mississippi Sound. At the mooring site, the rigging crew arranged and moored the barges. The Mr. T was spudded down to the west of a small island with its stern facing south. The Miss Tiff and the Jack King were tied to the Mr. T, on its west side. The Miss Tiff's stern also faced south, and one of its wing barges was interlocked behind the stern of the Mr. T. The Jack King was positioned on the Miss Tiff's bow, and the two were connected using two lines at their corner bits. A team of riggers returned to the barges on August 28, added two additional lines, and let out slack on the Mr. T's spud lines so that the flotilla could rise and fall with the surge. In all, Signal's crews used a combined eleven parts[7] of two-inch, eight-braid nylon rope to secure the barges.

At its maximum intensity, Hurricane Katrina had sustained winds of 170 miles per hour, rendering it a Category 5 hurricane. Weakening as it approached the Gulf Coast, it made landfall on August 29, 2005, in southeast Louisiana, as a Category 3 hurricane with sustained winds of 127 miles per hour. Approximately sixty miles to the east, at the mooring site, the barges were subjected to Category 1 winds, ranging from eighty to ninety miles per hour, with gusts of 100 to 110 miles per hour. The storm surge was between fourteen and sixteen feet, corresponding to a Category 4 surge, with wave heights of approximately two feet.

---

[7] A "part" is a single line from point A to point B. Thus, a full wrap from bit A around bit B and back to bit A would be two parts.

6

After the hurricane, the Miss Tiff and the Jack King were found adjacent to the Interstate 10 bridge, sitting in a marsh. Interstate 10 runs generally east to west, and the impacted bridge spans the Pascagoula River basin, including the east and west branches of the river, as well as the bayous and marshes in between. The area between the mooring site and allision site is a mixture of navigable water, bayous, marshes, and dry land with some trees. The barges had allided with the bridge while the storm surge was between six and eight feet, displacing the eastbound lanes by four to five feet. The nylon mooring ropes were frayed, although all but one of the mooring bits was intact—the damaged bit had apparently been crushed during the impact with the bridge. Before alliding with the bridge, the barges had drifted approximately 4.7 miles north-northwest of the mooring site. Powered by wind and the surge's current, the barges were estimated to have covered that distance at a pace of 2.3 knots per hour. At that velocity, it took approximately two hours for the barges to float from the mooring site to the allision site. The exact route that the barges took, however, is unknown.

After the storm, MDOT invited contractors to place bids for a contract to perform repairs on the damaged sections of the bridge. T.L. Wallace Construction, Inc. submitted the lowest bid, and MDOT awarded it the contract. T.L. Wallace Construction completed the repairs on September 30, 2005, ahead of schedule. It received a total of $6,268,191, including a $1,000,000 early completion bonus. The federal government reimbursed MDOT for the cost of the repairs in late January 2006. Any recovery in this lawsuit by MDOT will accrue to Mississippi's coffers, to be held in an emergency fund for future emergencies and credited against amounts that the federal government agrees to pay in the event of any such emergencies.

7

After the bench trial, the district court issued its findings of fact and conclusions of law. It held that Signal failed to timely object to MDOT's status as a real party in interest and thus waived that defense. The court also held that Signal was not exonerated from liability because the owner of a vessel must overcome a presumption of fault when that vessel allides with a fixed structure and because Signal failed to rebut this presumption. In particular, the court found that the allision was not an inevitable accident or vis major because Hurricane Katrina, at the mooring site, was not an act of God such that no reasonable preparations could have prevented the allision and because the conditions experienced were foreseeable. The court further found that Signal's negligence, in employing an improvised, untested method of securing the Miss Tiff and the Jack King using nylon ropes, caused the allision. Although Signal was not exonerated from liability, the district court limited its liability under 46 U.S.C. § 30505 to the combined value of the Miss Tiff and the Jack King. It so ruled because Schnoor, Signal's sole managing agent for its Pascagoula facilities, had no knowledge or privity of the fault that caused the allision. In particular, "Schnoor had no knowledge concerning the condition of the spud motor or the mooring arrangement and plan used prior to the storm." See In re Signal Int'l, LLC, No. 1:05-CV-477, slip op. at 19 (S.D. Miss. July 15, 2008). Thus, the district court entered final judgment for MDOT, awarding it $1,146,000, the fair market value of the Jack King and the Miss Tiff, plus post-judgment interest and costs. The court omitted mentioning or ruling on MDOT's request for prejudgment interest.

MDOT appealed, and Signal cross-appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II.  DISCUSSION

On appeal, we consider four issues: (1) whether the district court abused its discretion in holding that Signal failed to timely object to MDOT's status as a real party in interest; (2) whether Signal was entitled to exoneration because it owed no duty to MDOT to act non-negligently; (3) whether the district court clearly erred by finding that Signal was entitled to limit its liability to the value of the Miss Tiff and the Jack King because it lacked knowledge or privity of the faulted mooring arrangement; and (4) whether the district court abused its discretion by failing to award prejudgment interest.

### A.  Real Party in Interest

Signal asseverates that MDOT is not the real party in interest because the federal government paid for the costs of the repairs to Interstate 10 and any recovery will be refunded to the federal government.  The district court held that Signal waived this defense by failing to timely object to MDOT's status.  We review for abuse of discretion the district court's ruling that Signal's challenge was untimely and that the defense was thus waived.  See Rogers v. Samedan Oil Corp., 308 F.3d 477, 484 (5th Cir. 2002).

Rule 17(a)(1) of the Federal Rules of Civil Procedure requires that "[a]n action must be prosecuted in the name of the real party in interest."  We have defined the real party in interest as "the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."  Farrell Constr. Co. v. Jefferson Parish, La., 896 F.2d 136, 140 (5th Cir. 1990).  The purpose of this requirement "is to assure a defendant that a judgment will be final and that res judicata will protect it from having to twice defend an action, once against an ultimate beneficiary of a right and then

against the actual holder of the substantive right." Id. at 142; see also Gogolin & Stelter v. Karn's Auto Imps., Inc., 886 F.2d 100, 102 (5th Cir. 1989) ("The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles.").

Although an action must be prosecuted by the real party in interest, "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." FED. R. CIV. P. 17(a)(3). This provision requires the defendant to object in time to allow the opportunity for joinder of the ostensible real party in interest, and the defense may be waived if the defendant does not timely object. See Gogolin & Stelter, 886 F.2d at 102. The defendant timely objects so long as joinder of the real party in interest remains "practical and convenient." Rogers, 308 F.3d at 484. Objection is typically practical in the early stages of litigation—disputes regarding the real party in interest "are likely to be evident to a defendant at the onset of suit, because [he] almost always knows whether he has been sued by the party who 'owns' the claim." Gogolin & Stelter, 886 F.2d at 102; see also Doherty v. Mut. Warehouse Co., 245 F.2d 609, 610–11 (5th Cir. 1957) (raising objection contemporaneously with a motion to dismiss). "The earlier the defense is raised, the more likely that the high cost of trial preparation for both parties can be avoided if a real party in interest question is determined adversely to a plaintiff." Rogers, 308 F.3d at 484 (quotation marks and citation omitted). Tardy objection is inconvenient when it hinders the "goal of judicial efficiency" or manifests the

defendant's intention to "lay behind the log" in ambush. See id.; Gogolin & Stelter, 886 F.2d at 102.

There is no magic formula for determining practicality and convenience. See 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1554 (2d ed. 1990) (noting that Rule 17 does not "indicate when the challenge should be made" and documenting that an objection should be made with "reasonable promptness"). The decision turns on the facts of each case and is within the discretion of the district court. Id. ("[T]he courts should be given the flexibility to treat the waiver question as one addressed to their discretion so that the issue can be determined in terms of what seems appropriate in a particular case."). The relevant factors for making this determination are when the defendant knew or should have known about the facts giving rise to the plaintiff's disputed status as a real party in interest; whether the objection was raised in time to allow the plaintiff a meaningful opportunity to prove its status; whether it was raised in time to allow the real party in interest a reasonable opportunity to join the action if the objection proved successful; and other case-specific considerations of judicial efficiency or fairness to the parties.

A few examples illustrate our review of these factors. In Gogolin & Stelter, 886 F.2d at 102, the defendant raised the defense for the first time in a motion for a directed verdict. The defendant had not pleaded the issue, did not raise it in interrogatories or requests for admissions, and did not address it in the pretrial motion. Id. As such, we held that the defendant's posture was "surely" contrary to the rule. Id. at 102–03. Similarly, in Rogers, 308 F.3d at 484, the defendant raised the defense the day before trial. We credited the district court's conclusion that "this late notice did not afford [the plaintiff] a meaningful

opportunity to prove [its status] or allow [the ostensible real party in interest] an opportunity to join as a party to the lawsuit." Id. We specifically rejected the defendant's assertion that it lacked prior knowledge of the relevant facts because discovery mechanisms were available and underemployed, the plaintiff was forthright in its responses, and the defendant should have been aware that the ostensible real party in interest, an insurer, may have contributed to the settlement at issue. Id. We also approved of precedent from our sister courts of appeals that affirmed district courts' holdings that the defendants had waived the defense earlier in the litigation. See id. 484 n.4 (citing United HealthCare Corp. v. Am. Trade Ins. Co., 88 F.3d 563, 569 (8th Cir. 1996) (defense first asserted at pretrial conference one week before trial constituted waiver); Hefley v. Jones, 687 F.2d 1383, 1388 (10th Cir. 1982) (defense first asserted 16 days prior to trial constituted waiver)).

In this case, the district court did not abuse its discretion in holding that Signal waived the defense by failing to timely object. Signal did not move to dismiss the suit for lack of the real party in interest and did not challenge MDOT's status as the real party in interest until the eve of trial. It first raised a legal challenge to MDOT's status as a real party in interest in the pretrial order dated March 20, 2008, less than two weeks before trial.[8] Yet Signal's

---

[8] Signal claims that its inclusion of the issue in the pretrial order meant that it was not waived because that order supersedes all prior pleadings and controls the scope of trial. See Elvis Presley Enters., Inc. v. Barry Capece, 141 F.3d 188, 205 (5th Cir. 1998). This argument is without merit. That the pretrial order preserves all prior motions incorporated therein does not mean that any issue raised therein for the first time was timely asserted. It is axiomatic that some matters must be raised in earlier pleadings to be timely. See, e.g., FED. R. CIV. P. 9(a) (lack of capacity must be raised by specific denial in the defendant's answer); FED. R. CIV. P. 12(h)(1)(B)(ii) (requiring certain defenses to be raised by motion or responsive pleadings). Thus, "[w]hile pleading is not required to raise a real party in interest challenge, the specific procedure and policy outlined in Rule 17(a) are equally amenable to finding waiver for an

proposed findings of fact and conclusions of law argue that MDOT was reimbursed as early as January 2006, over two years before trial; as such, the defense could and should have been discovered, raised, and resolved well in advance of trial.[9] In fact, Signal's earlier submissions to the district court evidence its prior knowledge of the fact on which it now relies—they recited that the federal government had reimbursed MDOT and that MDOT had not lost any money. Those submissions, however, failed to object or otherwise notify MDOT, the federal government, or the district court that MDOT was not a real party in interest and that the federal government should be substituted.[10] Although

untimely assertion of the issue." Gogolin & Stelter, 886 F.2d at 103 n.3.

As the pretrial order shaped the trial proceedings, Signal also points to its questioning of MDOT's witnesses at trial about the timing and extent of federal reimbursement. It argued that it tried the issue by consent. See FED. R. CIV. P. 15(b). Notwithstanding trial by consent, Rule 17(a)(3) protects the real party in interest by providing it with the opportunity to join before trial. Allowing a trial-by-consent of the issue under Rule 15(b) over the district court's waiver ruling would hinder the joinder of the appropriate party and thus severely undermine the goal of judicial efficiency. See Gogolin & Stelter, 886 F.2d at 103 ("This argument is untenable; the concept of trial by consent should not be stretched so as to conflict with the procedure and policy prescribed by [R]ule 17(a)." (citation omitted)). Thus, MDOT's failure to object to arguably non-relevant testimony does not render Signal's challenge to MDOT's status timely. Moreover, as discussed below, MDOT's entitlement to prejudgment interest would depend on its loss of the use of its funds, for which the timing of its reimbursement—and trial of that issue—is relevant.

[9] Signal claims that MDOT was not forthcoming in admitting the federal government's reimbursement. Signal, however, has directed us to no record evidence showing MDOT's alleged obfuscation. In addition, Signal had recourse to the district court to remedy any unresponsive discovery responses by MDOT, and its submissions to the district court belie its lack of knowledge by showing that it had prior knowledge that the federal government had reimbursed MDOT.

[10] MDOT's responsive arguments on the merits, however, show that the mere statement of federal reimbursement would not have put the court or opposing parties on notice of an objection to MDOT's uncertain status as a real party in interest—reimbursement was relevant to but may not have been controlling of the issue of MDOT's status. MDOT counters that it was legally obligated to repair the bridge as trustee and proprietor of Interstate 10; that state law provides it with the authority and duty to pursue the claim; that federal reimbursement

Signal now contends that it intended to pursue this defense from the outset, it did not plainly do so. In this case, the district court did not abuse its discretion in holding that Signal did not timely object and, thus, that the defense was thus waived.

## B. Exoneration, Duty, and Foreseeability

Signal next argues that it was entitled to exoneration from liability because the damage to the Interstate 10 bridge was not a foreseeable consequence of its negligent mooring of the Miss Tiff and the Jack King.[11] It has framed the issue of foreseeability as determinative of its duty to MDOT. With respect to Signal's duty, the district court held that "the damages caused were foreseeable in that MDOT was within the class of those for which damage would

---

was a collateral source that was not a matter of right; that federal regulations require the state to make "prompt and diligent efforts . . . to recover repair costs from the legally responsible parties," 23 C.F.R. §668.105(f); and that any recovery would be placed in a fund that the state (not the federal government) administers, subject to later credits to the federal government after future emergencies. Because the district court did not abuse its discretion in holding that Signal waived its defense, we do not weigh the merits of these complex arguments here.

[11] On appeal, Signal does not challenge the district court's conclusion that it failed to overcome the presumption of fault that the owner of the moving vessel bears in allision cases. Under maritime law, when a vessel breaks free from its moorings and drifts into an allision with a stationary object, the moving vessel is presumed at fault. The Louisiana, 70 U.S. (3 Wall.) 164, 168 (1865); Dammers & Van Der Heide Shipping & Trading (Antilles), Inc. v. The Steamship Joseph Lykes (In re United States), 425 F.2d 991, 995 (5th Cir. 1970). The drifting vessel is presumptively liable for damages unless it can "show that her drifting was the result of an inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." In re United States, 425 F.2d at 995. The district court found, inter alia, that in Pascagoula, Hurricane Katrina was not an act of God such that reasonable care could not have prevented the allision. Thus, "Signal has not met its burden of demonstrating that it acted with reasonable care when mooring its barges and that it has failed to rebut the presumption of liability for the allision with the Interstate 10 bridge in Pascagoula, Mississippi." See In re Signal Int'l, No. 1:05-CV-477, slip op. at 15. Because Signal has not challenged this conclusion, we assume that Signal's fault, not the natural forces wrought by Hurricane Katrina, led to the allision.

be expected if barges moored on the Pascagoula River broke free during a hurricane, i.e. those owning property near the Pascagoula River." In re Signal Int'l, No. 1:05-CV-477, slip op. at 13 n.12. Determination of the tortfeasor's duty is a question of law and thus a function of the court that we review de novo. See Canal Barge Co. v. Torco Oil Co., 220 F.3d 370, 376 (5th Cir. 2000); Lloyd's Leasing Ltd. v. Conoco, 868 F.2d 1447, 1449 (5th Cir. 1989); Consol. Aluminum Corp. v. C.F. Bean Corp., 833 F.2d 65, 67 (5th Cir. 1987).[12]

Maritime tort law governs the question of whether Signal owed a duty to MDOT. See Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330, 333 (5th Cir. 1993). "The analysis of a maritime tort is guided by general principles of

---

[12] In its brief, Signal argues alternatively that it might be seeking review of the district court's factual determinations. (Signal's Br. 63–64 ("Even if the Court believes that this issue is more properly viewed as a factual finding subject to review under a clearly erroneous standard, Signal maintains that even this standard is met and that reversal is warranted.").) Signal's mixed statements regarding our standard of review are not unfounded in light of the multiple roles of foreseeability. We have historically considered foreseeability relevant to both the duty and proximate cause determinations. See Republic of Fr. v. United States, 290 F.2d 395, 399 (5th Cir. 1961) ("[N]ot only proximate causal connection but also the very existence of a duty the breach of which will constitute actionable negligence depends upon reasonable foreseeability of consequences."); see also 1 DAN B. DOBBS, THE LAW OF TORTS 336–37 (2001) (recognizing that foreseeability also entails determinations of the standard of care—"what a reasonable person would do about the [recognizable] risks."); 3 STUART M. SPEISER ET AL., THE AMERICAN LAW OF TORTS 68 (2008) (The doctrine of foreseeability "is sometimes framed in the concept of 'duty,' in other instances as one of 'proximate cause.'"). The difference between defining the issue of foreseeability as one of duty or proximate cause is the standard of review that we apply. We review duty de novo because it is a matter of law, while we review proximate cause using a clearly erroneous standard because, in maritime cases, it is considered an issue of fact. See Omega Protein, Inc. v. Samson Contour Energy E&P LLC (In re Omega Protein, Inc.), 548 F.3d 361, 367 (5th Cir. 2008); see generally RESTATEMENT (THIRD) OF TORTS–LIABILITY FOR PHYSICAL HARM § 7 cmt. a (Proposed Final Draft No. 1, 2005) (reporting that the important difference between no-duty rules and proximate cause—also labeled the scope-of-liability doctrine—"is that no-duty rules are matters of law decided by the courts, while the defendant's scope of liability is a question of fact for the factfinder"). Because the parties have briefed foreseeability solely as a question of duty, we confine our analysis to that legal determination.

negligence law." Consol. Aluminum, 833 F.2d at 67 (citing Casaceli v. Martech Int'l, Inc., 774 F.2d 1322 (5th Cir. 1985); Daigle v. Point Landing, Inc., 616 F.2d 825 (5th Cir. 1980)). Under general tort principles, "a tortfeasor is accountable only to those to whom a duty is owed." Id. (citing, e.g., Watz v. Zapata Offshore Co., 431 F.2d 100 (5th Cir. 1970)); see also Canal Barge, 220 F.3d at 376 (holding that to establish maritime negligence, a plaintiff must demonstrate, inter alia, that there was a duty owed by the defendant to the plaintiff). Thus, if Signal owed no duty to MDOT, it is not liable for the allision and is entitled to exoneration. See Consol. Aluminum, 833 F.2d at 67; Watz, 431 F.2d at 104; see generally CLARENCE MORRIS & C. ROBERT MORRIS, JR., MORRIS ON TORTS 127 (2d ed. 1980) (commenting that this form of no-duty rule "interdicts trial of the fault issue; it relieves [the defendant] from liability even though [the defendant] is at fault.").

"Duty . . . is measured by the scope of the risk that negligent conduct foreseeably entails." Consol. Aluminum, 833 F.2d at 67 (quotation marks and citation omitted); see also id. (the determination of duty "involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." (citing, e.g., PROSSER AND KEETON ON TORTS § 53 (5th ed. 1984)); see generally 1 DOBBS, supra, at 466 ("The defendant is liable for harms he negligently caused so long as a reasonable person in his position should have recognized or foreseen the general kind of harm the plaintiff suffered."); 3 FOWLER V. HARPER ET AL., HARPER, JAMES AND GRAY ON TORTS § 18.2, at 762 (3d ed. 2007) ("The obligation to refrain from that particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably

dangerous."); MORRIS, supra, at 162 ("Only when damages to someone could have been anticipated by a reasonable person in defendant's position is the defendant negligent."). "Foreseeability obviously marks the limits placed on a defendant's duty; the precise meaning of the concept is vital." Consol. Aluminum, 833 F.2d at 67.

"The test [of foreseeability] is whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct." 3 SPEISER, supra, at 71; see also 1 DOBBS, supra, at 463 ("[F]oreseeability is a short hand expression intended to say that the scope of the defendant's liability is determined by the scope of the risk he negligently created."). Although we sometimes speak in terms of probability, we do so not in a mathematical, more-likely-than-not usage, but in terms of the "natural and probable" risks that a reasonable person would likely take into account in guiding her practical conduct. See Republic of Fr., 290 F.2d at 401; Consol. Aluminum, 833 F.2d at 68 ("[F]oreseeability . . . includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct." (quotation marks and citation omitted)); see generally 3 HARPER, supra, at 768 ("[I]n this inquiry foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct."). The scope of danger incorporates "not only those [natural] forces which are constantly and habitually operating but also those forces which operate periodically or with a certain degree of frequency." Republic of Fr., 290 F.2d at 400 (quotation marks and citation omitted); see generally 3 HARPER, supra, at 765 ("[W]e look to see what natural forces and

what human conduct should have appeared likely to come on the scene, and we weigh the dangerous consequences likely to flow from the challenged conduct in the light of these interventions.").  The emphasis in this determination is on the general types of harm and classes of persons within the scope of danger created by the negligence while accounting for probable or anticipated natural forces. See Republic of Fr., 290 F.2d at 400 ("It is sufficient that the defendant would reasonably have anticipated consequences or an injury of the general nature of that which ensued." (quotation marks omitted)).  Consistent with these general principles, in Consolidated Aluminum, 833 F.2d at 68, we defined the concept of foreseeability by reference to general classes of harms and victims:

> We perceive a harm to be the foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.

The critical question in this case is whether the allision with the Interstate 10 bridge was a harm of the general sort to an entity of a general class that a reasonably thoughtful person might have anticipated to result from Signal's negligent mooring of the Miss Tiff and the Jack King in light of the anticipated natural forces wrought by Hurricane Katrina.  As the question makes clear, our analysis does not focus on the particular allision site, but the general risk of allision; it does not focus on MDOT, but on the class of property owners in the paths available to the runaway barges.  We agree with the district court that the risk of allision with a fixed structure located within the reach of the anticipated storm surge was foreseeable if the barges broke free due to negligent mooring. Allision with fixed structures is one of the principal risks of a vessel, moored inland, that breaks from its negligently executed moorings.  For example, in In

18

re Kinsman Transit, 338 F.2d 708, 722 (2d Cir. 1964), Judge Friendly's learned discussion of the role of foreseeability in defining duty in admiralty cases led the Second Circuit to hold that "a ship insecurely moored in a fast flowing river is a known danger not only to herself but to the owners of all other ships and structures down-river, and to persons upon them." Considering the topology of the area, the Interstate 10 bridge was within the general class of fixed structures in the low-lying areas near the Pascagoula River against which the Miss Tiff and Jack King could foreseeably allide when propelled by the anticipated storm surge, and the general class of persons for which the harm of allision was foreseeable were those possessing fixed or other property within the path of the anticipated surge, including, in this case, MDOT. Signal does not dispute this general sort of foreseeable harm and these foreseeable plaintiffs, and we find the risk of these sorts to be dispositive of its duty.

To support a lack of foreseeability, Signal instead recites the fact that the Miss Tiff and the Jack King traveled 4.7 miles over typically non-navigable land before alliding with the Interstate 10 bridge. In asking us to hold that it had a duty only if it could have foreseen the "specific risk" of allision with this particular portion of the Interstate 10 bridge, Signal proposes too narrow of an inquiry. See 1 DOBBS, supra, at 467 ("When the defendant unleashes large physical forces such as those associated with . . . large ships broken loose from their moorings . . ., he creates risks that injury could be caused in diverse ways, too numerous and particular to foresee in detail. . . . The[se] cases call[] for the rule that if I foresee the risk in general, I need not foresee the details."); MORRIS, supra, at 165 ("The exact consequences do not have to be foreseen."); 3 SPEISER, supra, at 71 ("It is not essential that the (initial) tortfeasor be able to foresee the

exact nature and extent of the injuries or the precise manner in which the injuries occur."). We find no principled reason to break with our precedent that guides our determination of duty by reference to the general sorts of harms that are reasonably foreseeable consequences of the scope of danger risked by the negligence involved. See Consol. Aluminum, 833 F.2d at 68; accord City of New York v. Agni (In re City of New York), 522 F.3d 279, 284 (2d Cir. 2008) ("The probability that the injury would occur in this case . . . is very small. But the risk, while small, is undoubtedly foreseeable. The City freely admits that it was aware of the possibility . . ., just as any reasonable person would be aware of that possibility."); In re Kinsman Transit, 338 F.2d at 722 ("The shipowner and the wharfinger in this case having thus owed a duty of care to all within the reach of the ship's known destructive power, the impossibility of advance identification of the particular person who would be hurt is without legal consequence." (citations omitted)).

Even when we move beyond the general sort of harms risked by the negligence and delve into the details of this case to determine whether the allision was a probable result considering the interplay of natural forces, we find that neither the distance covered by the barges nor the lack of typically navigable water around the allision site rendered the allision unforeseeable. The test of foreseeability is not measured against normal conditions, but those that were anticipated or reasonably should have been anticipated. See Consol. Aluminum, 833 F.2d at 68 (holding that foreseeability incorporates "the interplay of natural forces"); In re Kinsman Transit, 338 F.2d at 724 ("[W]here . . . the damage was caused by just those forces whose existence required the exercise of greater care than was taken—the current, the ice, and

20

the physical mass of the [vessel], the incurring of consequences other and greater than foreseen does not . . . provide a reasoned basis for insulation.") (citing HART AND HONORE CAUSATION IN THE LAW 234–48 (1959)).

In this case, the approaching hurricane, the expected height and predicted movement of the storm surge, and the topology of the Pascagoula River basin gave rise to the need to moor the barges and made this allision a foreseeable consequence of negligence in that mooring. Signal expected and prepared for a Category 4 hurricane.[13] That preparation was designed to secure its vessels and facilities against the risk of 155 miles-per-hour winds and eighteen-feet storm surges. The hurricane winds experienced at the mooring site were not that strong, reaching Category 1 speeds at eighty to ninety miles per hour with gusts from 100 to 110 miles per hour. At the mooring site, the peak storm surge corresponded to that of a Category 4 hurricane—as was anticipated—with depths of fourteen to sixteen feet.[14] Waves were likely two feet high. Thus, the hurricane exposed the barges to anticipated forces.

Signal also foresaw that, in a large storm, its vessels would escape from the mooring site, despite the shelter offered by that location. The Miss Tiff and the Jack King were moored in a shallow portion of the east branch of the Pascagoula River. The site was partially protected by a ridge of land and trees on the north side. Nonetheless, Signal's own witnesses—including Schnoor; Gene Rice, Signal's engineering and emergency preparedness manager; Bingle;

---

[13] Although Hurricane Katrina was not forecast to directly hit the Pascagoula area, Signal does not contest that it anticipated a Category 4 hurricane.

[14] The district court concluded that the surge was not a factor in the breaking of the nylon ropes at the mooring site. Because Signal's fault is not contested on appeal, we review the anticipated and actual storm surge heights to support our findings regarding whether a reasonable person would have foreseen the barges reaching the Interstate 10 bridge.

and Michael J. Schiehl, one of Signal's expert witnesses—testified that if the vessels broke free due to faulty mooring, they would have expected them to head north into the marshes outside of the sheltered mooring area. Thus, they anticipated that the barges could leave the mooring site and the general confines of the Pascagoula River's east branch.

Once unmoored and outside of the mooring area, however, the topology of the Pascagoula River basin combined with the anticipated height of the surge made it foreseeable to a reasonably thoughtful person that the barges could reach the Interstate 10 bridge. Navigable waters extended well north of Interstate 10. The Interstate 10 bridge crosses both branches of the river, and the area between the two river branches forms a flat, open, lowland channel of marshes, grassy wetlands, creeks, bayous, and lakes. In fact, the area between the mooring site and the allision is sufficiently flat that a mere quarter-mile upriver from the mooring site, the Interstate 10 bridge is visible over the marshes. Signal's naval architect and one of its experts, Alfonso M. Sotres, testified that during the surge, the water would fill in the Pascagoula River channel and move to the north-northwest. Both Schiehl and Tanner testified that with a ten- to fifteen-feet surge, they would expect "an unobstructed waterway right to the bridge." There were no natural or man-made obstructions or barriers between the mooring site and the Interstate 10 bridge.[15] Because of the lack of other obstructions north of the mooring site, the Interstate 10 bridge was arguably the most likely target for a runaway vessel, as it served as a backstop to the marshlands.

---

[15] In fact, Signal's witnesses referenced the lack of any physical structures up to Interstate 10 as a reason justifying its selection of the mooring site.

The allision in this case occurred in a way that was consistent with these predictable natural forces. During the surge, the water flowed upriver, at first following the course of the existing waterways, and then filling the entire basin. As might be expected in an eighteen-feet storm surge over a low-lying marshland, the surge rendered the lower Pascagoula River like a shallow lake: "It was like a lake in the surge," according to Schiehl. That the allision occurred in an area that was typically marshland did not render the allision unforeseeable because a reasonable person could expect that a storm surge would inundate normally dry land.[16] The Miss Tiff and the Jack King broke from the Mr. T and allided with the Interstate 10 bridge before the maximum height of the surge. The storm surge produced "tremendous" force and was moving the barges at two to three miles per hour at the time of allision.[17] The allision probably occurred between 8:00 a.m. and 9:00 a.m. on August 29, 2005. At the time, the surge was around six to eight feet and its current pushed in a northwest direction. The exact course of the Miss Tiff and the Jack King is unknown, although their starting point to end point trajectory followed the channel from the mooring site to the north or north-northwest.[18]

---

[16] We have frequently defined a storm surge to be a type of coastal flood over typically dry land. See Tuepker v. State Farm Fire & Cas. Co., 507 F.3d 346, 352–53 (5th Cir. 2007); Leonard v. Nationwide Mut. Ins. Co., 499 F.3d 419, 435–37 (5th Cir. 2007).

[17] In order to allide with the bridges while moving in a north or north-west direction, the barges must have allided before the peak surge, at which point the current would slow and reverse direction, heading back out to sea. The peak surge likely occurred a few hours later, between 11:00 a.m. and 12:00 p.m.

[18] Depending on when they broke from their moorings, they may have traveled farther up the east branch of the Pascagoula River until the surge flowed into the marshes or may have directly entered the marshes from the mooring site and headed north-northwest.

While the distance that these barges covered and the exact allision point were undoubtedly "surprising" to those involved, we find that it was foreseeable to a reasonable person considering the interplay of the anticipated hurricane forces and the Pascagoula River basin's known topology. Based on the facts of this case, "[w]e go only so far as to hold that where, as here, the damages resulted from the same physical forces whose existence required the exercise of greater care than was displayed and were of the same general sort that was expectable, unforeseeability of the exact developments . . . will not limit liability." In re Kinsman Transit, 338 F.2d at 726.[19]

We hold that Signal owed a duty to MDOT because allision with the Interstate 10 bridge in the Pascagoula River basin was foreseeable. The allision

---

[19] Signal places heavy reliance on Consolidated Aluminum and Lloyd's Leasing. Neither case supports its argument that it did not owe MDOT a duty because the harms in those cases did not arise from the risk of danger created by negligence and instead involved the improbable interplay of natural and human forces. In Consolidated Aluminum, 833 F.2d at 66, a dredging company negligently damaged a submerged natural gas pipeline. The gas supplier shut down the supply, which deprived an aluminum processing plant several miles away of the natural gas needed to operate its turbines, with the ultimate result of damaging its equipment and product-in-process. Id. The plant was the only aluminum processing plant without a backup power supply. Id. The court held that such loss "goes beyond the pale of general harm which reasonably might have been anticipated by negligent dredgers." Id. at 68. In Lloyd's Leasing, 868 F.2d at 1448, a vessel grounded off the coast of Louisiana, spilling crude oil into the waters of the Gulf of Mexico. The oil washed ashore on Galveston Island, approximately 70 miles west. Id. Tourists and beach goers then tracked oil onto the premises of the eventual claimants. Id. The court affirmed the district court's determination that the harm was not foreseeable because the vessel owner "had no reason to have anticipated that the oil would probably wash ashore in a heavily populated area and then be tracked into businesses and homes." Id. at 1449. In each case, the harm was not of the type risked by the negligent acts, and the party at fault was able to identify events that would not have been foreseen by a reasonable person. See id. (oil washing ashore "where there were people to track it and places to track it into"); Consol. Aluminum, 833 F.2d at 66 (natural gas loss causing shut down of equipment at plant with the "unique distinction of having only one energy source"); see also Republic of Fr., 290 F.2d at 398–99, 401 (explosion of chemicals previously thought by "the scientific field as well as the transportation industry" to be stable even when exposed to fire).

was a harm of the general sort to an entity of the general class that might have been anticipated by a reasonably thoughtful person as a probable consequence of the negligent mooring of the barges on the Pascagoula River in light of the interplay of the expected storm surge and the surrounding topology. The district court thus did not err in holding that Signal was not entitled to exoneration.

## C. Limitation of Liability

MDOT contends that the district court erred by holding that Signal is entitled to limitation of liability under the Limitation of Liability Act, 46 App. U.S.C. § 183(a) (2006) (repealed and re-codified in similar form at 46 U.S.C. § 30505).[20] Because entitlement to limitation of liability is a fact issue, we review the district court's finding for clear error. In re Omega Protein, 548 F.3d at 368; Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1469 (5th Cir. 1991) ("It is well settled law that . . . in maritime actions the 'clearly erroneous' rule applies to the review of the factual findings of the trial court."); accord Tucker v. Calmar S.S. Corp., 457 F.2d 440, 444 (4th Cir. 1972) ("A district court's findings regarding unseaworthiness and negligence are generally treated as findings of fact reviewable under the 'clearly erroneous' standard of [Federal Rule of Civil Procedure] 52(a).") (citing Tex. Menhaden Co. v. Palermo, 329 F.2d 579 (5th Cir. 1964); Morales v. City of Galveston, 275 F.2d 191 (5th Cir. 1960)).

The Limitation of Liability Act provides:

The liability of the owner of any vessel . . . for any loss, damage, or injury by collision . . . incurred, without the privity or knowledge of

---

[20] In 2006, Congress codified, reorganized, and restated portions of the appendix to title 46 of the United States Code. See Pub. L. No. 109-304 (2005). Section 183(a) of the appendix to title 46 was codified at section 30505 with slightly modified language. Congress's intent was to "codif[y] existing law rather than creat[e] new law." See H.R. Rep. 109-170, at 2 (2005), reprinted in 2006 U.S.C.C.A.N. 972, 973.

> such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

46 App. U.S.C. § 183(a). "Once a claimant proves that negligence or unseaworthiness caused an accident, an owner seeking limitation must show it lacked privity or knowledge of the condition." Gateway Tugs, Inc. v. Am. Commercial Lines, Inc. (In re Kristie Leigh Enters., Inc.), 72 F.3d 479, 481 (5th Cir. 1996) (footnote omitted); see also Verdin v. C&B Boat Co., 860 F.2d 150, 156 (5th Cir. 1988). "'Privity or knowledge,' sometimes described as 'complicity in the fault,' extends beyond actual knowledge to knowledge that the ship owner would have obtained by reasonable investigation." Cupit v. McClanahan Contractors, Inc., 1 F.3d 346, 348 (5th Cir. 1993) (quoting Brister v. AWI, Inc., 946 F.2d 350, 356, 358 (5th Cir. 1991)).

"Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, 'else it could always limit its liability.'" Cont'l Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1376 (5th Cir. 1983) (quoting Coryell v. Phipps, 317 U.S. 406, 410–11 (1943)). A corporation "is charged with the knowledge of any of its managing agents who have authority over the sphere of activities in question." In re Kristie Leigh Enters., 72 F.3d at 481; see also Cont'l Oil, 706 F.2d at 1376 ("A corporation is prevented from limiting its liability by the act of a managing agent when 'the negligence is that of an executive officer, manager or superintendent whose scope of authority included supervision over the phase of the business out of which the loss or injury occurred . . . .'" (omission in original) (quoting Coryell, 317 U.S. at 410–11)). A "managing" agent or officer is "anyone to whom the corporation has

26

committed the general management or general superintendence of the whole or a particular part of its business." Cont'l Oil, 706 F.2d at 1376 (quoting The Erie Lighter 108, 250 F. 490, 494 (D.N.J. 1918)); see also Cupit, 1 F.3d at 348 ("For the purposes of limitation, a corporation is charged with the privity or knowledge of its employees when they are sufficiently high on the corporate ladder.").

The district court found that "the managing agent for the rigging department was Mr. Schnoor." In re Signal Int'l, No. 1:05-CV-477, slip op. at 20. It also found that "Schnoor had no knowledge concerning the condition of the spud motor or the mooring arrangement and plan used prior to the storm." Id. at 19. In particular, "he did not have any prior knowledge of the problems encountered when attempting to moor the barges." Id. at 20. The district court thus held that "Signal has met its burden of proof that it lacked privity or knowledge" and that it was "entitled to limit its liability to the value of the barges post-accident." Id. MDOT contends that the district court clearly erred because Schnoor had privity or knowledge of (1) the negligent mooring through his approval of the hurricane plan and (2) the Miss Tiff's purported unseaworthiness through his attendance at the seventy-two hour meeting. We hold that the district court did not clearly err.

MDOT first asks us to impute knowledge of the negligent mooring to Schnoor based on his approval of the hurricane plan. Signal's plan called for the barges to be moved upriver and moored using barge spuds or other suitable moorings. Schnoor's approval of the hurricane plan permitting other suitable moorings, with the rigging crew to determine the suitability of alternative arrangements, was not the basis of the district court's finding of negligence; the untested method and negligent execution of the alternative arrangement was.

Only when the need arose on the evening of August 26, 2005, after the plan was finalized and approved, did Tanner and Bingle decided to tie the Miss Tiff and the Jack King to the Mr. T using rope moorings. Tanner instructed the crew on how the barges should be oriented and moored with nylon ropes.[21] Schnoor's approval of this plan in no way imputed to him knowledge of the negligent nylon rope moorings that Bingle and Tanner decided to employ. Schnoor was not directly involved with the securing of the barges because securing the barges was a relatively unimportant task that could be delegated to an experienced rigging crew. See In re Omega Protein, 548 F.3d at 374 (holding that managing agents may delegate non-managerial duties and discretion to experienced employees without subjecting the owner to unlimited liability). The rigging crews that completed the moorings were experienced, and there is no evidence showing prior failures by those riggers necessitating investigation or greater oversight by Signal's managing agents. Thus, Schnoor did not have knowledge of this untested mooring scheme or of any negligence in executing it.[22] Based on these facts, we hold that the district court did not clearly err when it held that Signal met its burden of showing that it lacked privity with or knowledge of the negligent mooring.

---

[21] Although Bingle and Tanner were aware that the spud motor was not functioning and that the spuds could not be used due to the obstruction of the exposed fiberoptic cable, MDOT has not argued on appeal that either of them was one of Signal's managing agents.

[22] MDOT's arguments rest heavily on the contention that the district court found that the hurricane plan was negligent. We disagree. The district court found that the source of Signal's negligence, considered in light of the presumption of fault in allision cases, was the failure to design, test, and execute a suitable alternative mooring arrangement, not an inadequacy in the approved hurricane plan.

MDOT next asks the court to find that the Miss Tiff was unseaworthy and to construct Schnoor's knowledge of that purported lack of seaworthiness from the rigging crew's atypical plan to bring the Jack King to the mooring site, which it claims he should have discovered during the seventy-two hour meeting. "A shipowner has an absolute nondelegable duty to provide a seaworthy vessel." Brister, 946 F.2d at 355. "[U]nseaworthiness is predicated without regard to fault or the use of due care." Id. (quotation marks omitted). Although "[t]he courts have struggled to supply and put to use meaningful criteria to determine seaworthiness, tossed between the horns of liability without fault and fitness of a sufficiently high standard," Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 196 (5th Cir. 1967), we have defined that "[t]o be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended," Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir. 1988) (citing Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960)); see also Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 213 (1963) (holding that the seaworthiness doctrine provides "in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used"); Weeks v. Alonzo Cothron, Inc., 466 F.2d 578, 581 (5th Cir. 1972) (defining a seaworthy vessel as "a vessel and appurtenances reasonably fit for their intended use"); Walker v. Harris, 335 F.2d 185, 191 (5th Cir. 1964) ("Seaworthiness . . . is reasonable fitness to perform or do the work at hand."). This definition generally balances operating proficiency against anticipated operating conditions. Mills v. Mitsubishi Shipping Co., 358 F.2d 609, 613 (5th Cir. 1966).

> The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or the particular fitting under scrutiny, sufficient to withstand those anticipated forces? If the answer is in the affirmative, the vessel (or its fitting) is seaworthy. If the answer is in the negative, then the vessel (or the fitting) is unseaworthy no matter how diligent, careful, or prudent the owner might have been.

*Walker*, 335 F.2d at 191.

At the time of the seventy-two hour meeting, the Miss Tiff's spud motor was inoperable, so Signal's rigging department planned to use the crane on the Jack King to moor the Miss Tiff using its spuds. The district court did not reach an express finding that the Miss Tiff was unseaworthy due to the inoperable spud motor. It did, however, find that Schnoor lacked knowledge of its inoperable spud motor and that "[s]puds are not absolutely necessary, and problems with the spud motor do not prevent the barges from performing their usual work in the yard or from being moored." In re Signal Int'l, No. 1:05-CV-477, slip op. at 5 n.5, 19. MDOT had argued for a finding of unseaworthiness, and, considering the deference we pay to the district court's findings, we interpret the district court's failure to hold Signal liable on this basis as a finding that the claim of unseaworthiness was not established. See In re Kinsman Transit, 338 F.2d at 716 ("[W]e take the judge's failure to fault the [defendant shipowner] on this score as a finding . . . that the claim was not established.").

We hold that the district court did not clearly err for two reasons: (1) the facts support that the inoperable spud motor was not the proximate cause of the allision, and (2) the facts support that Schnoor did not have constructive knowledge of the inoperable spud motor. Signal's burden to prove lack of privity

or knowledge only arises when MDOT has shown unseaworthiness was the proximate cause of the loss. See In re Omega Protein, 548 F.3d at 371 ("[I]f the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." (quotation marks and citations omitted)); Brister, 946 F.2d at 355 ("[A] plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury" (quotation marks and citation omitted)); Empresa Lineas Maritimas Argentinas S.A. v. United States, 730 F.2d 153, 155 (5th Cir. 1984) (first determining "what acts of negligence or conditions of unseaworthiness caused the accident" before determining "whether the shipowner had knowledge of the events which caused the loss"); accord Hellenic Lines, Ltd. v. Prudential Lines, Inc. (In re Hellenic Lines, Ltd.), 813 F.2d 634, 639 (4th Cir. 1987) ("Only conditions of unseaworthiness that contribute to the collision are relevant to determining whether the shipowner is entitled to limitation."). For example, in In re Hellenic Lines, the Fourth Circuit held that the ship owner had "effectively overcome" the condition that could have rendered the ship unseaworthy through an alternative remedial plan, rendering the sole proximate cause of the harm the negligent noncompliance with that remedial plan and not the original source of potential unseaworthiness. 813 F.2d at 639 ("Hellenic had effectively overcome [the second mate's] inability by its instructions that, in a low visibility situation, the master of the ship was to be summoned to the bridge.").

Under the facts of this case, we cannot find fault with the district court's finding that the spud motor was not necessary to the functioning of the Miss Tiff. See Tucker, 457 F.2d at 444 (affirming "the well established admiralty maxim

that a ship need not provide the best or safest gear or method of operation, only gear or a method which is reasonably safe and fit for the purposes for which it is intended") (citing, e.g., Marshall, 378 F.2d 193). Although helpful to mooring, a spud motor was not necessary for the Miss Tiff to be seaworthy in this case—either in the shipyard or on its voyage upriver to the mooring site.[23] The Miss Tiff was outfitted with the necessary bits and nylon rope to perform the work at hand—i.e., securing it to the Mr. T at the mooring site—and to prevent the harm that followed. There is no evidence that the bits and nylon rope were not fit to perform their assigned tasks, if designed and executed non-negligently, and there was ample evidence from which the district court could conclude that the Miss Tiff's bits and nylon rope rendered it fit for the task at hand. MDOT has made no showing that the district court clearly erred when it determined that the inoperable spud motor was not necessary for mooring. Having agreed with the district court's factual premise, we concur with its implicit downstream finding that the inoperable spud motor was not the proximate cause of the allision. Although recognizing that the Miss Tiff's spud motor was inoperable, the district court concluded that the untested and faulty nylon rope mooring arrangement, not the inoperable spud motor, was the proximate cause of the allision. MDOT has not shown that the district court's proximate cause determination was clearly erroneous.

Thus, whether or not Schnoor had constructive knowledge of the inoperative spud motor is immaterial. Even then, however, we conclude that the

---

[23] Indeed, MDOT has not argued that the Jack King was unseaworthy, despite the fact that it was not outfitted with barge spuds at the time of Hurricane Katrina. Notably, the trial testimony revealed that not all barges are outfitted with barge spuds; many barges are moored using bits, bollards, and ropes.

district court did not clearly err when it held that Schnoor lacked knowledge of the inoperable spud motor. While his inquiry about the Jack King during the seventy-two hour meeting might have notified Schnoor of the broken spud motor, even an in-depth investigation at that time would not have notified him that the Miss Tiff was not capable of being moored with barge spuds. At the time, his lieutenants had a viable alternative plan to use the crawler crane loaded on the Jack King to moor the Miss Tiff with barge spuds. The district court did not clearly err on these facts when it concluded that Schnoor lacked constructive knowledge of a small, later-occurring part of the overall operations under his charge that he delegated to an experienced crew. To hold otherwise would nullify the requirement that a high-level managing agent have knowledge or privity of the negligence or unseaworthiness that caused the harm. Such a holding would also impose a requirement that a managing agent tasked with facility-level emergency preparations speculate about unforeseen events and engage in potentially onerous detailed review of the plans of lower level decision makers who are themselves tasked with the discretion to run relatively minor aspects of the facility's operations. The district court's conclusion regarding lack of privity and knowledge is not clearly erroneous.

Overall, we hold that the district court did not clearly err by finding that Signal lacked privity or knowledge of the relevant negligence that gave rise to the allision.

D. Prejudgment Interest

MDOT claims that the district court should have awarded it prejudgment interest. The district court did not mention prejudgment interest in its findings of fact and conclusions of law or in its judgment. "[I]n maritime cases the award

of prejudgment interest is the rule, rather than the exception, and the trial court has discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable." Corpus Christi Oil & Gas Co. v. Zapata Gulf Marine Corp., 71 F.3d 198, 204 (5th Cir. 1995); see also City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 196 (1995) ("By compensating for the loss of use of money due as damages from the time the claim accrues until judgment is entered, an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred." (quotation marks and citations omitted)). We review for clear error the district court's factual determination of the existence of peculiar circumstances, while we review for abuse of discretion the district court's exercise of the discretion to deny prejudgment interest that accompanies the existence of any peculiar circumstance. Corpus Christi Oil & Gas, 71 F.3d at 204. In Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 730 (5th Cir. 1980), we held that "[i]f the trial court does not make any mention of prejudgment interest in its judgment or its findings of fact and conclusions of law, then it is . . . difficult to infer that the trial court has found peculiar circumstances and decided to exercise the discretion that those circumstances create." We, nonetheless, "may make that inference, and [are] especially likely to do so when the record clearly discloses peculiar circumstances." Id. If the record discloses no peculiar circumstances, "we have reversed the judgment of the district court insofar as it fails to award prejudgment interest" and either modify the judgment to award prejudgment interest "or remand with directions to calculate and award prejudgment interest." Id.

34

In this case, the district court omitted any reference to prejudgment interest. Thus, under the framework established in Noritake, we analyze the record to determine if the existence of a peculiar circumstance was clear. Peculiar circumstances include equitable doctrines that caution against the award. See Reeled Tubing, Inc. v. M/V Chad G, 794 F.2d 1026, 1028 (5th Cir. 1986). Based on the record evidence, we find that the federal government's reimbursement of the repair costs to MDOT in January 2006 was a peculiar circumstance because it would inequitably allow MDOT to recover prejudgment interest for the period after it was reimbursed and thus had full use of its money. See City of Milwaukee, 515 U.S. at 196 (holding that an award of prejudgment interest restores a party to the condition it enjoyed before the injury occurred by compensating the plaintiff for the loss of the use of money it would have had at its disposal between the injury and the judgment). Having concluded that the factual predicate existed to permit the district court to exercise its discretion to deny prejudgment interest for the period after the federal government reimbursed MDOT, we also conclude that the district court did not abuse its discretion in denying prejudgment interest for that period.

It did, however, err by failing to award prejudgment interest for the period from the injury on August 29, 2005, to the date of reimbursement in January 2006. Before the federal government reimbursed MDOT, MDOT was without the use of its money. Signal's briefing to the district court conceded that 155 days elapsed between the injury and the federal government's reimbursement. On the record before us, we thus conclude that the factual predicate of a peculiar circumstance did not exist for that period. Without that factual predicate, the district court lacked discretion to deny prejudgment interest for this earlier

period, and its implicit denial of prejudgment interest for that period was clearly erroneous. We therefore vacate judgment to the extent it excludes prejudgment interest prior to the time that MDOT was reimbursed by the federal government and remand to the district court with directions that it make additional factual findings as necessary to calculate that interest and enter judgment awarding MDOT prejudgment interest for that period.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment in part, VACATE it in part, and REMAND. We AFFIRM the judgment to the extent that it denied Signal's objection to MDOT's status as a real party in interest, denied Signal's petition for exoneration from liability, and granted Signal's petition for limitation of liability. We VACATE the judgment to the extent that the district court failed to grant MDOT's motion for prejudgment interest for the period prior to the federal government's reimbursement to MDOT, consistent with this opinion. We REMAND for calculation of prejudgment interest and for entry of judgment including that interest. Each party shall bear its own costs.