# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-30504

United States Court of Appeals
Fifth Circuit

**FILED**
February 26, 2016

Lyle W. Cayce
Clerk

JAB ENERGY SOLUTIONS II, L.L.C.,

     Plaintiff – Appellee

v.

SERVICIO MARINA SUPERIOR, L.L.C.; CASHMAN EQUIPMENT CORPORATION,

     Defendants – Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:13-CV-556

Before PRADO, OWEN, and HAYNES, Circuit Judges.

PER CURIAM:*

     Cashman Equipment Corp. ("Cashman") and its subsidiary Servicio Marina Superior, LLC ("SMS") appeal the district court's judgment awarding damages to JAB Energy Solutions II, LLC ("JAB") for breach of contract. Cashman and SMS argue that the district court erred when it: (1) found that Cashman and SMS breached the contract's warranty of seaworthiness and the warranty to perform transportation services with "due dispatch"; (2) concluded

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-30504

that neither the contract's terms nor a subsequent agreement between JAB and Cashman barred JAB's claim; and (3) determined that Cashman was the alter ego of SMS. For the reasons that follow, we AFFIRM the district court's judgment in all respects as to SMS, AFFIRM the dismissal of Cashman's counterclaim for failure to brief the issue properly, and REVERSE the judgment of liability as to Cashman, which was predicated on an erroneous alter ego finding; we RENDER judgment in favor of Cashman on JAB's claims against it.

## I.  Background

After being awarded a job to transport and install an oil drilling platform in Malaysia, JAB contacted an employee of SMS and Cashman for the estimated cost to tow the drilling platform by ocean tug and barge from Louisiana to Malaysia. On March 1, 2012, the employee sent an email to JAB providing details of a potential voyage. It designated a vessel owned by SMS, the Atlas, as the tug to perform the job. The email made predictions regarding the voyage's length, the vessel's speed and fuel consumption, and noted that only two fuel stops would be required. This email was expressly incorporated into the Contract of Affreightment (the "Contract"), which was signed by JAB and SMS on June 1, 2012. While another email and a voyage plan submitted by SMS to JAB further outlined the details of the voyage, they were not expressly incorporated into the Contract. The cost of the project in the Contract was $5,048,000.

On June 16, 2012, the Atlas—which had received work on its engines a few months prior—left Louisiana to perform the Contract, tugging the JMC-3330 barge, owned by Cashman, with the drilling platform attached. During the journey, the Atlas experienced significant difficulties. The Atlas's starboard main engine reported constant issues that required numerous

2

repairs, the chief engineer was fired, and at one point, the tug's tow bridle broke and had to be fixed.

On the afternoon of July 12, JAB emailed representatives at SMS and Cashman to suggest that they find a replacement tug as soon as possible, a suggestion that SMS and Cashman rejected. Two days later, JAB then notified SMS and Cashman that it had located a tug to replace the Atlas on its own in order to complete the voyage to Malaysia. On July 23, JAB replaced the Atlas and also executed the Barge Bareboat Charter (the "Bareboat Charter") with Cashman, which arranged for JAB's continued use of the JMC-3330 barge to transport the drilling platform to Malaysia.

JAB filed suit against SMS and Cashman on March 26, 2013, claiming breach of contract and seeking all costs associated with the replacement of the Atlas. Cashman asserted a counterclaim seeking the amount still due under the Bareboat Charter for the continued use of the barge. After a bench trial, the district court ruled for JAB and dismissed Cashman's counterclaim. The district court, describing a long list of problems with the Atlas, noted that the Atlas made unexpected stops to refuel and undergo repairs, vastly exceeded fuel consumption estimates, and had failed to even approach the speed described in the emails and the voyage plan provided to JAB.[1] As a result, the district court determined that it was reasonable for JAB to find a replacement tug, and that JAB had no choice but to sign the Bareboat Charter for continued use of the JMC-3330 barge because the drilling platform was already secured to the JMC-3330's deck. It also concluded that neither the terms of the Contract nor the Bareboat Charter barred JAB's contractual claim. The district court found that SMS breached the terms in the Contract requiring

---

[1] The district court found that it took the Atlas twenty-one days to reach Panama, at which point it had consumed 68,894 gallons of fuel. The voyage plan projected that this leg of the trip would take around eight days and consume 32,000 gallons of fuel.

3

No. 15-30504

SMS to tender the Atlas "in a seaworthy condition, fully equipped and fully capable to performing the intended services," and also breached its express obligation to "perform the transportation services with due dispatch." The district court also determined that Cashman was the alter ego of SMS, and was thus also liable despite not being a signatory to the Contract. It entered judgment against Cashman and SMS for $4,864,214.89, plus $439,576.02 in attorneys' fees. Cashman and SMS timely appealed.

## II. Jurisdiction and Standard of Review

The district court had jurisdiction over this admiralty action under 28 U.S.C. § 1333. As with any bench trial, we review findings of fact for clear error and issues of law de novo. *Mid-South Towing Co. v. Exmar Lux* (*In re Mid-South Towing*), 418 F.3d 526, 531 (5th Cir. 2005). The interpretation of contracts is a question of law reviewed de novo. *Dell Comput. Corp. v. Rodriguez*, 390 F.3d 377, 384 (5th Cir. 2004). "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004).

"[A] district court's findings on unseaworthiness are findings of fact and therefore are reviewed for clear error." *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002). We review alter ego determinations for clear error. *Zahra Spiritual Tr. v. United States*, 910 F.2d 240, 242 (5th Cir. 1990). A finding of fact is clearly erroneous when, after viewing the evidence in its entirety, we are left with a definite and firm conviction that a mistake has been made. *See Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258–59 (5th Cir. 2006).

4

No. 15-30504

### III. Discussion

*A. SMS's breach of the Contract's express warranties*

Cashman and SMS argue that the district court clearly erred when it found that the Atlas was unseaworthy. To be seaworthy, a vessel must be "reasonably suited for the purpose or use for which [it was] intended." *In re Signal Int'l, LLC*, 579 F.3d 478, 498 (5th Cir. 2009) (citation omitted). This requires that "a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers . . . be reasonably fit for the purpose for which they are to be used[.]" *Id.* (citation omitted).

Article 3(A) of the Contract expressly warranted that the Atlas would be seaworthy when tendered:

> <u>Warranties.</u> Carrier [SMS] shall tender the Vessels to Shipper [JAB] in a seaworthy condition, fully equipped and fully capable to performing the intended services as advised in advance by [JAB] to [SMS] with all documentation, licensing and permits required for routine operation of the Vessels.

In finding that SMS failed to tender a seaworthy vessel, the district court credited the testimony of an SMS employee who revealed that the Atlas had previously experienced fuel-consumption problems and that it emitted thick black smoke as it was sailing away from Louisiana. It also referenced the daily email reports provided by the Atlas during the voyage that indicated recurring engine problems, excessive fuel consumption, and issues with the Atlas's engineer. Accordingly, we are not left with a definite and firm conviction that the district court made a mistake and therefore conclude that

5

it did not clearly err in finding that the Atlas was tendered in an unseaworthy condition. *See Boudreaux*, 280 F.3d at 468.

In the alternative, SMS claims that the district court erroneously ignored Article 4B[2] of the Contract, which, according to SMS, was a waiver of the express warranty of seaworthiness at tender. However, we have held that to adequately waive the warranty of seaworthiness, a contract must do so "clear[ly] and unequivocal[ly]." *Thomas Jordan, Inc. v. Mayronne Drilling Mud, Chem. & Eng'g Serv.*, 214 F.2d 410, 412 (5th Cir. 1954). In *Thomas Jordan*, we held that an inspection provision stating that a customer "has had the barge inspected and found same to be in first-class condition" was not sufficiently clear and unequivocal to constitute a waiver. *Id.* We specifically noted that the customer only inspected the exterior of the vessel and that the inspection provision was on the vessel owner's pre-printed form. *Id.* Similarly, SMS's inspection provision was part of SMS's pre-printed form and JAB only inspected the exterior of the Atlas. The inspection provision here failed to unequivocally waive any warranty of seaworthiness. *See id.* Accordingly, the district court correctly determined that Article 4(B) did not bar JAB's unseaworthiness claim.[3]

SMS further maintains that the district court erred in determining that SMS breached the warranty to conduct the voyage with "due dispatch." Article 3A on warranties states: "Carrier [SMS] shall perform transportation services

---

[2] Article 4(B) of the Contract states: "Inspection. Shipper [JAB] shall be responsible for inspecting the Vessels, including their fittings, gear and equipment, prior to acceptance at tender to determine their suitability and fitness for the intended services, with Shipper to note any deficiencies in writing to Carrier prior to the commencement of loading cargoes. Upon Shipper's acceptance of the Vessels or commencement of loading, whichever shall first occur, Shipper shall be deemed to have acknowledged and agreed that the Vessels, including their fittings, gear and equipment, are in all respects suitable and fit for the intended services."

[3] Nor did the district court err in holding that the Contract's indemnity provisions presented no obstacle to JAB's contractual claims.

No. 15-30504

with 'due dispatch,' but makes no warranty as to speed or arrival/departure times." SMS's obligation to perform with "due dispatch" is informed by the email sent to JAB—expressly incorporated into the Contract—that outlined the Atlas's planned fuel consumption, speed, and the number of fuel stops for the voyage. While the Contract made no firm guarantees as to speed or arrival times, these initial estimates provide an outline as to the obligations of SMS. The district court found that, due to SMS's negligence, the Atlas failed to even come close to reaching any of these estimated figures. The Atlas vastly exceeded the estimated fuel consumption, made multiple unexpected stops for repair and refueling, and fell woefully short of the estimated speed as outlined in the email.[4] The district court did not err in finding that SMS breached the "due dispatch" warranty.[5]

*B. Neither the terms of the Contract nor the terms of the Bareboat Charter barred JAB's claim*

SMS also claims that the district court improperly failed to apply Article 8,[6] the provision of the Contract that bars JAB from recovering consequential damages. General or direct damages are "damages that are recoverable . . . for injuries that are the natural result of the breach" or "[l]osses that an ordinary

---

[4] The email incorporated into the Contract estimated that the Atlas would average a speed of seven knots, consume around 4,000 gallons of fuel per day, and make two stops to refuel. The district court found that the Atlas averaged around three or four knots, more than doubled the estimated fuel consumption, and made two additional unplanned stops in Manzanillo and San Diego for repairs.

[5] As we hold that the district court did not err in concluding that SMS violated the warranty of "due dispatch" based upon terms expressly incorporated into the Contract, we need not address whether the district court properly assessed other extrinsic evidence to determine whether SMS breached its "due dispatch" obligation.

[6] Article 8 states: "Neither Carrier [SMS], Shipper [JAB] nor any Vessel shall be responsible for any special or consequential damages whatsoever and howsoever caused, including the unseaworthiness of either of the Vessels or the sole or concurrent negligence of either Carrier or Shipper, including without limitation, extra expense, loss of earnings, loss of profits, loss of use and business interruption, whether resulting from negligence, unseaworthiness, breach of this Contract or otherwise, even if the possibility of such damages may have been foreseeable."

7

person would expect to follow the breach." 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 56.6, at 102, 103 (2005). By contrast, consequential or special damages are losses "suffered as a 'consequence' of the breach of duty, but not as a direct and immediate and foreseeable consequence." *Id.* at 105. SMS's argument fails because the damages awarded are not consequential damages. The damages awarded represent the costs of hiring a tug to replace the unseaworthy and inadequate Atlas.[7] They stem from the direct, immediate and foreseeable consequence of the Atlas being unable to perform the voyage. The district court did not err in deeming the ban on consequential damages inapplicable.[8]

Also unpersuasive is SMS's argument that the Bareboat Charter—the agreement between Cashman and JAB for the continued use of the JMC-3330 barge—constituted a release of JAB's claims or, in the alternative, a novation of the original Contract. Upon examination of the terms of the Bareboat Charter, we conclude that it does not indicate any intent by JAB to release any contractual claims or to novate the prior Contract. The district court correctly concluded that the Bareboat Charter presented no bar to JAB's claims.

## C. *Cashman was not the alter ego of SMS*

Cashman and SMS further argue that the district court erred when it found that Cashman was the "alter ego" of SMS. Under the alter ego doctrine, a court may bind a corporation to an agreement entered into by its subsidiary

---

[7] Given the lack of availability of other substitute tugs in the area to replace the Atlas, these damages also cannot be characterized as an "extra expense," an item barred under the consequential damages provision of the Contract in Article 8.

[8] SMS also attempts to argue that under the language of Article 8, the Contract defined consequential damages to include any claims based on the unseaworthiness of the vessels, thus barring JAB's claim. However, interpreting Article 8 to bar all claims based on the unseaworthiness of the Atlas would then ignore a basic principle of admiralty contract interpretation by rendering meaningless the express warranty of seaworthiness in Article 3(A). *See Chembulk Trading LLC*, 393 F.3d at 555. We reject SMS's argument.

when their conduct demonstrates a virtual abandonment of separateness. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan* (*Bridas I*), 345 F.3d 347, 358–59 (5th Cir. 2003). However, we have stated that "'fraud' may be required to pierce the corporate veil in contract cases, because the party seeking to utilize the doctrine has had the opportunity, during negotiations with a subsidiary, to obtain assurances . . . from its parent." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan* (*Bridas II*), 447 F.3d 411, 417 (5th Cir. 2006); *see also United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 692 (5th Cir. 1985) ("[I]n contract cases, fraud is an essential element of an alter ego finding."). Here, JAB never alleged that SMS or Cashman committed fraud. Further, JAB could have negotiated with Cashman to agree to the same warranties assented to by SMS, but failed to do so in the Contract. Accordingly, the determination that Cashman was the alter ego of SMS was clearly erroneous. *See Zahra Spiritual Tr.*, 910 F.2d at 242. As such, Cashman should not have been held liable for SMS's breaches.[9]

## IV. Conclusion

For the reasons set forth above, we AFFIRM the decision of the district court as to SMS and the dismissal of Cashman's counterclaim, REVERSE the judgment against Cashman, and RENDER judgment in its favor on JAB's claims against it.

---

[9] Cashman's counterclaim was mentioned in its brief on appeal, but it failed to brief the issue of the effect of a ruling against SMS on the merits but in Cashman's favor on alter ego. Its sole argument regarding the counterclaim was as follows: "A plain reading of the contract and settled law negates all of these findings [holding SMS liable]. This Court should set aside the District Court's finding of breach. [sic ,] The natural consequence of which would be to revive Cashman's counterclaim." This argument fails because we affirm SMS's liability. We conclude that any separate arguments about Cashman's counterclaim fail for want of adequate briefing. *See In re Repine*, 536 F.3d 512, 518 n.5 (5th Cir. 2008).