# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 19, 2021

Lyle W. Cayce
Clerk

No. 19-40718

Francisco Ortega Garcia, *individually and as surviving spouse of Patricia Guadalupe Garcia Cervantes, and as successor-in-interest to the estate*; *and as next friend of* V.S.O.G., *a minor child*,

*Plaintiff—Appellant*,

*versus*

United States of America; Mercury Marine, *a division of Brunswick Corporation*; Safe Boats International, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:17-CV-28

Before Jolly, Jones, and Willett, *Circuit Judges*.
Don R. Willett, *Circuit Judge*:

While patrolling the Brownsville Ship Channel around midnight, a United States Coast Guard vessel struck and killed Patricia Guadalupe Garcia Cervantes, a Mexican citizen who was attempting to enter the United States illegally by swimming across the Channel. Litigation ensued. Francisco Ortega Garcia, individually and on behalf of his and Cervantes' daughter, V.S.O.G., brought (1) negligence and wrongful death claims

No. 19-40718

against the United States and (2) products liability, gross negligence, and wrongful death claims against the manufacturers of the vessel and its engines, Safe Boats and Mercury Marine.

The district court dismissed everything. It dismissed the negligence claim against the United States, concluding that the United States owed no duty to Cervantes. It dismissed the products liability claims against Safe Boats and Mercury Marine, concluding that Cervantes, as a bystander, lacked standing to bring those claims. And, because it dismissed all the underlying tort claims, the district court dismissed the wrongful death claims. For the reasons below, we affirm the dismissal of all Garcia's claims against the United States, Safe Boats, and Mercury Marine.

I

A

The Brownsville Ship Channel (BSC) lies just three miles north of the mouth of the Rio Grande and connects the Port of Brownsville with the Gulf of Mexico.[1] The BSC is a "high-traffic waterway, travelled day and night by various vessels from small fishing boats to large tankers."[2] In

---

[1] *See United States v. Ruiz-Hernandez*, 890 F.3d 202, 206 (5th Cir. 2018) (describing the BSC).

[2] *Id.*

general, "there is no posted speed limit" on the BSC,[3] and "[t]here are no lights along the [BSC], making it very dark at night."[4]

The United States Coast Guard maintains a station on South Padre Island, near the BSC. The station's "primary missions" include "search and rescue and maritime law enforcement." Coast Guard law enforcement patrols roughly 30 miles of the Texas coast and several nearby waterways, including the BSC. The purpose of the patrols is "to deter and interdict immigrants and narcotic smugglers, ensure safety and security of the maritime facilities within the Port of Brownsville, and to conduct commercial and recreational vessel boardings to enforce various safety and security laws and regulations."

The Coast Guard's patrol route follows a southwestern course, departing from the South Padre Island station, traveling along the BSC, passing the Shrimp Basin, and reaching the Port of Brownsville Turning Basin, at which point the patrol crew turns around and heads back to the station. Coast Guard crews conduct BSC patrols aboard a Special Purpose Craft-Law Enforcement (SPC-LE) vessel. The Coast Guard developed specifications for the SPC-LE, including that it be a "planing" vessel, a type of vessel in which the bow rises while it is accelerating, only to fall again when

---

[3] The one exception is the no-wake zone in the Shrimp Basin, a docking area on the BSC's north side where vessels must travel slowly. *Id.*

[4] *Id.* Although the Port of Brownsville commercial complex, located along the shores of the BSC between the Shrimp Basin and the Port of Brownsville Turning Basin, has "numerous commercial maritime facilities" that "have significant lighting that illuminates the general vicinity within the BSC," "[t]he remainder of the BSC, northeast from the Shrimp Basin"— where the incident occurred—"is mostly undeveloped with minimal shore side lighting."

No. 19-40718

it reaches "planing speed" of approximately 19.2 knots.[5] The Coast Guard awarded the SPC-LE manufacturing contract to Safe Boats. Safe Boats complied with the Coast Guard's "planing" vessel specifications when it supplied its SPC-LEs, and these vessels included engines with propeller drives manufactured by Mercury Marine.

\*          \*          \*

At 9:53 p.m. on April 23, 2015, four United States Coast Guard members commenced a patrol of the BSC aboard an SPC-LE vessel.[6] At all relevant times, the vessel's navigation lights were on. Around 11:00 p.m., one of the crewmembers requested and received permission to accelerate the vessel to come up on plane. Two crewmembers assert that they looked forward before the vessel came up on plane and did not see anything in the water. In approximately 30 seconds, the vessel came up on plane. The vessel then transited for approximately 30 seconds at an average speed of 30.86 knots until the crew heard a "thud" or "thump" sound under the vessel's hull. The crew stopped the vessel, turned it around, and searched the area to identify the source of the sound. They spotted and recovered a pink plastic innertube. After this search, the crew continued the patrol and returned to the Coast Guard station around 12:40 a.m.; they reported to Coast Guard officials and showed their superiors the recovered pink innertube.

Unbeknownst to the crew, Patricia Guadalupe Garcia Cervantes, a Mexican citizen, and Galdino Jose Ruiz-Hernandez, a human smuggler, had

---

[5] *See* Mark Corke, *Getting an Outboard Boat on Plane*, Boat U.S., https://www.boatus.com/magazine/2018/february/getting-on-plane.asp (describing how to get a boat "on plane").

[6] The four United States Coast Guard members will be referred to as the crew. The crew consisted of a certified coxswain, a break-in-coxswain, a boarding officer, and a crewmember.

No. 19-40718

been attempting to illegally enter the United States by swimming across the BSC.[7] Cervantes was using a pink innertube as a flotation device. Cervantes was struck by the Coast Guard crew's vessel approximately 30 seconds after the vessel had fully come up onto plane. An autopsy, conducted three days after this incident, revealed that the injuries on Cervantes' body were consistent with the shape of the vessel's propeller blades, and the coroner determined that Cervantes "died nearly instantly" after the collision "because of the initial blunt force trauma and blood loss." The Coast Guard conducted an investigation of the incident, which was summarized in a Major Incident Report, completed on July 14, 2015.

B

Francisco Ortega Garcia brought this suit in his individual capacity, as Cervantes' spouse and administrator of her estate, and on behalf of his and Cervantes' minor daughter, V.S.O.G. Garcia asserted several claims against three defendants: (1) negligence and wrongful death claims against the United States for the Coast Guard's operation of the vessel; (2) strict products liability, gross negligence, and wrongful death claims against Safe Boats regarding the vessel; and (3) strict products liability, gross negligence, and wrongful death claims against Mercury Marine regarding the vessel's engines.

The United States moved to dismiss parts of Garcia's negligence claim for lack of subject-matter jurisdiction.[8] Safe Boats moved for partial

---

[7] Ruiz-Hernandez was convicted of one count of conspiring to bring in, transport, and harbor an alien resulting in death and one count of transporting an alien within the United States for private financial gain and resulting in death. We upheld his conviction and sentence on appeal. *Ruiz-Hernandez*, 890 F.3d at 208, 213.

[8] The United States moved to dismiss the portions of Garcia's negligence claim alleging improper design of the vessel and lack of proper training and supervision of Coast

No. 19-40718

summary judgment on four different issues.[9] While all these motions were pending, the magistrate judge issued a Report and Recommendation (R&R), recommending that all of Garcia's claims be dismissed. Garcia timely filed objections to the R&R. The district court overruled Garcia's objections, adopted the magistrate judge's R&R in its entirety, and dismissed all of Garcia's claims with prejudice. Specifically, the district court determined that: (1) Garcia failed to identify what duty the United States owed to Cervantes; (2) he failed to show that Safe Boats and Mercury Marine had a duty to warn Cervantes; (3) he could not maintain the maritime products liability claims because Cervantes, as a "casual bystander," lacked standing to bring those claims; and (4) he could not maintain wrongful death claims because all the underlying tort claims were dismissed. Garcia appealed.

## II

Before reaching the issues that Garcia raises on appeal, there are three threshold matters: (1) whether the district court had subject-matter jurisdiction; (2) whether Garcia has standing to sue in his individual capacity; and (3) the proper standard of review. We address each in turn.

## A

First, we address the parties' confusion about the basis for the district court's subject-matter jurisdiction.[10] Because Garcia brings claims against

---

Guard personnel, arguing those claims were barred by sovereign immunity and outside the discretionary function exception to the waiver of sovereign immunity.

[9] Safe Boats filed motions for partial summary judgment on the issues of (1) punitive damages, (2) Garcia's lack of standing, (3) proximate cause, and (4) the government contractor defense.

[10] The magistrate judge noted the "disagreement between the parties over the jurisdictional bases of [Garcia's] claims." "[S]ubject-matter jurisdiction is not waivable,"

No. 19-40718

the United States, our subject-matter jurisdiction analysis involves two inquiries: (1) Did the United States waive its sovereign immunity? And if so, (2) does diversity or admiralty subject-matter jurisdiction apply?

Turning to the first inquiry: To maintain a suit in district court against the United States, a plaintiff must bring claims under a statute in which Congress expressly waives the United States' sovereign immunity.[11] Garcia brings his claims under the Federal Tort Claims Act (FTCA)[12] or, in the alternative, the Suits in Admiralty Act (SIAA)[13] and the Public Vessels Act (PVA).[14] Determining which waiver statute applies matters because the FTCA excludes claims in admiralty, while the SIAA and PVA do not.[15] So, we must first decide whether Garcia's claims are admiralty claims.

A party seeking to invoke federal admiralty jurisdiction over a tort claim must demonstrate that the tortious activity (1) "occurred on navigable water" or that an "injury suffered on land was caused by a vessel on navigable water," and (2) bears a "connection with the maritime activity."[16] Garcia has done both. First, he alleges that Cervantes' death occurred on the BSC.

---

and we are "under a continuing duty to inquire into the basis of jurisdiction in the district court." *Warren v. United States*, 874 F.2d 280, 281–82 (5th Cir. 1989).

[11] *See Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 112 F.3d 1283, 1287 (5th Cir. 1997) ("[T]he United States is immune from suit unless it consents, and the terms of its consent circumscribe our jurisdiction.").

[12] 28 U.S.C. § 1346(b)(1).

[13] 46 U.S.C. §§ 30901 *et seq.*

[14] 46 U.S.C. §§ 31101 *et seq.*

[15] 28 U.S.C. § 2680(d). *See also McCormick v. United States*, 680 F.2d 345, 348 (5th Cir. 1982); *Williams v. Central Gulf Lines*, 874 F.2d 1958, 1062 (5th Cir. 1989).

[16] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). *See* 28 U.S.C. § 1331.

No. 19-40718

Second, he alleges that her death was caused by a Coast Guard vessel, which clearly bears a connection with maritime activity.[17]

Federal Rule of Civil Procedure 9(h) specifies how a pleading may designate claims as admiralty claims.[18] A party need not make a specific reference to Rule 9(h) in his complaint, as long as the complaint contains "a simple statement asserting admiralty or maritime claims," which we have held sufficient to invoke a district court's admiralty jurisdiction.[19]

In his complaint, Garcia asserts that the district court has diversity subject-matter jurisdiction under 28 U.S.C. § 1332. Although Garcia's complaint does not refer to Rule 9(h) or to the district court's admiralty subject-matter jurisdiction under 28 U.S.C. § 1333, Garcia's complaint does contain a simple statement asserting maritime claims, which is sufficient for admiralty jurisdiction purposes.[20] These are admiralty claims because they involve a vessel collision. Because Garcia's case is one in admiralty, the relevant sovereign immunity statutory waivers are the SIAA and PVA, not the FTCA. And these statutory waivers apply because this case—a collision between a Coast Guard vessel and an individual—falls within their statutory scope. Because the SIAA and PVA waive the United States' sovereign

---

[17] *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 206 (1996) (citations omitted) (applying admiralty law in a case involving "a watercraft collision on navigable waters").

[18] FED. R. CIV. P. 9(h).

[19] *Teal v. Eagle Fleet, Inc.*, 933 F.2d 341, 345 (5th Cir. 1991).

[20] In addition, Garcia affirmatively stated that he did not object to the magistrate judge's R&R conclusion that Garcia had properly invoked admiralty jurisdiction as to all defendants, and the district court noted that Garcia elected to proceed under its admiralty jurisdiction.

No. 19-40718

immunity, the district court had subject-matter jurisdiction based in admiralty.

B

As a second threshold matter, we must address whether Garcia has standing to sue as Cervantes' surviving spouse.[21] To determine standing in maritime accident cases, we apply state wrongful death and survival statutes.[22] Texas law—the relevant state law here—provides that only the surviving spouse, children, and parents of a deceased individual may be the beneficiaries of wrongful death and survival suits.[23] Garcia admits that he and Cervantes were never formally married; he says that they had a common-law marriage. To prove a common-law marriage under Texas law, Garcia must provide evidence that that he and Cervantes (1) agreed to be married and after that agreement (2) lived together in Texas where (3) they represented to others that they were married.[24] Garcia and Cervantes never lived together in Texas, let alone represented to others in Texas that they were married. Because Garcia is unable to show that he is Cervantes' common-law spouse under Texas law, he does not qualify as Cervantes' surviving spouse and

---

[21] "The standing doctrine defines and limits the role of the judiciary and is a threshold inquiry to adjudication." *McClure v. Ashcroft*, 335 F.3d 404, 408 (5th Cir. 2003). Safe Boats raised the standing issue in its Motion for Partial Summary Judgment. Safe Boats and Mercury Marine again raise the standing issue in their brief. The United States does not raise this issue.

[22] *Yamaha*, 516 U.S. at 215–16.

[23] TEX. CIV. PRAC. & REM. CODE § 71.004(a) provides: "An action to recover damages . . . is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." *See id.* § 71.004(b).

[24] TEX. FAM. CODE § 2.401(a)(2).

No. 19-40718

therefore lacks standing in his individual capacity to bring wrongful death and survival claims.[25]

Notwithstanding his own lack of standing, Garcia may still maintain claims as next-of-friend for V.S.O.G., his child with Cervantes. Accordingly, we have jurisdiction to reach the merits of Garcia's claims.[26]

C

As a final preliminary matter, we must clarify the correct standard of review. When the district court dismissed Garcia's claims, it had several motions before it, including the United States' motion to dismiss Garcia's negligence claim and Safe Boats' four motions for partial summary judgment. The district court did not explicitly state which motions it was addressing, and it did not state the standard(s) it was applying.[27]

The district court dismissed Garcia's negligence claim against the United States on the grounds that Garcia failed to establish that the United

---

[25] Garcia relies on a Texas probate court's determination that he is an heir of Cervantes and designated as her spouse. But Texas family law, not the probate court's determination of marital status for purposes of inheritance law, determines standing for wrongful death and survival claims.

[26] We have jurisdiction under 28 U.S.C. § 1291.

[27] The magistrate judge's R&R also was unclear as to what motions it was addressing and what standard it was applying.

Although not raised as a stand alone issue, Garcia argues throughout his brief that the magistrate judge raised several of the reasons for dismissal *sua sponte*, including the magistrate judge's determination that Garcia failed to adequately identify the duty the Coast Guard owed Cervantes and that Cervantes was a "casual bystander" who lacked standing to bring products liability claims. Garcia argues this was improper because the United States had not filed a motion for summary judgment on his negligence claim, and Safe Boats and Mercury Marine had not moved for summary judgment on the "casual bystander" issue.

However, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come

No. 19-40718

States owed a duty to Cervantes and thus failed to allege a prima facie claim of negligence.[28] Determination of duty is a question of law that we review de novo.[29]

Turning to the remainder of Garcia's claims, the district court dismissed: (1) the failure-to-warn claims against Safe Boats and Mercury Marine because it found their duty to warn was owed to the United States, not to Cervantes; (2) the design defect claims against Safe Boats and Mercury Marine because Cervantes, as a "casual bystander," lacked standing to bring maritime products liability claims; and (3) the wrongful death claims against the United States, Safe Boats, and Mercury Marine because the underlying tort claims had been dismissed. In dismissing these claims, the district court relied on the R&R for the facts, which cited evidence outside the pleadings, so we treat the district court's order as a summary judgment ruling.

We review a district court's grant of summary judgment de novo, viewing all the facts and evidence in the light most favorable to the non-

---

forward with all of her evidence." *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (alteration omitted)). Applying a previous version of Federal Rule of Civil Procedure 56, we held that ten days' notice is sufficient to "grant summary judgment *sua sponte* on grounds not urged in a pending motion." *Lozano v. Ocwen Federal Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007). Here, Garcia objected to the magistrate judge's R&R fourteen days after it was filed. The district court adopted the magistrate judge's R&R in its entirety almost three months after those objections were filed. Because Garcia had sufficient notice that the district court might grant summary judgment on grounds not raised by the defendants, Garcia's argument of insufficient notice—to the extent he makes this argument—fails.

[28] In a footnote, the district court tangentially addressed the United States' 12(b)(1) motion to dismiss based on the discretionary function exception. Because it dismissed the products liability claims based on Cervantes' lack of standing, the district court did not address the discretionary function exception to a waiver of sovereign immunity.

[29] *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *In re Signal Int'l, LLC*, 579 F.3d 478, 490 (5th Cir. 2009)).

movant.[30] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31] A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[32]

\* \* \*

Summing up: We have subject-matter jurisdiction (because the United States waived its sovereign immunity under the SIAA and PVA) and the proper basis of subject-matter jurisdiction is in admiralty; Garcia does not have standing to sue in his individual capacity but may bring claims on behalf of V.S.O.G.; and we review the district court's grant of summary judgment and its duty determination de novo.

## III

Garcia raises several issues on appeal.

- *Regarding his negligence claim against the United States*, Garcia argues that the district court erred in finding that the United States owed no duty to Cervantes based on the lack of foreseeability.

- *For his products liability claims against Safe Boats and Mercury Marine*, Garcia contends: (1) the district court erred in applying the Restatement (Second) of Torts, which forecloses Cervantes' standing to maintain the products liability claims; (2) the district court erred in construing his products liability claims as brought against the United

---

[30] *Juino v. Livingston Par. Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir. 2013).

[31] Fed. R. Civ. P. 56(a).

[32] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

States, rather than Safe Boats and Mercury Marine; (3) the district court erred in dismissing the failure-to-warn claims and construing them as brought against the United States; and (4) the district court should have found that Safe Boats was not entitled to immunity as a government contractor.

- *Regarding the wrongful death claims against the United States, Safe Boats, and Mercury Marine*, Garcia argues that the district court erred in dismissing these claims by concluding that there were no underlying tort claims.

We address these arguments claim by claim.

## A

We first address Garcia's negligence claim against the United States.

Garcia asserts in his complaint that the United States is vicariously liable for the Coast Guard crew's failures to operate the vessel at a safe speed and with sufficient lighting, to keep a proper lookout, and to render aid to Cervantes. He argues that the Coast Guard has "a duty . . . to not cause personal injury or death by their own wrongful or negligent acts or omissions" and "to not allow a situation to develop which would cause the death of another human being." The district court determined that the United States owed no duty to Cervantes—and was therefore not liable—because the Coast Guard crew did not have actual knowledge about the possibility of hitting Cervantes as she swam across the BSC. And, since it found that there was no duty, the district court dismissed Garcia's negligence claim for failure to make out his prima facie claim. On appeal, Garcia argues

that the district court erred because it failed to consider facts known to the Coast Guard that address the foreseeability of harm.

We begin with the relevant law: "[N]egligence is an actionable wrong under general maritime law."[33] To maintain a negligence claim under admiralty law, the plaintiff must show "a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury."[34] We are concerned solely with the duty element.

Under general maritime law, "a tortfeasor is accountable only to those to whom a duty is owed."[35] More specifically, under the SIAA and PVA, the duty owed by the United States "is equal 'to that of a private person in like circumstances.'"[36] We must determine the existence and scope of that duty.[37] While our determination is guided by many factors, an especially important factor is "the foreseeability of the harm suffered by the complaining party."[38] And the foreseeability factor is the critical issue here: If the harm Cervantes suffered allegedly as a result of the Coast Guard crew's

---

[33] *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 842 (5th Cir. 2005). *See also Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 820 (2001) ("The general maritime law has recognized the tort of negligence for more than a century . . . .").

[34] *In re Great Lakes*, 624 F.3d at 211 (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2020)). *See also Withhart*, 431 F.3d at 842 (providing that the elements of a negligence claim in maritime law are "essentially the same as land-based negligence under the common law").

[35] *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987).

[36] *Southern Nat. Gas Co. v. Pontchartrain Materials, Inc.*, 711 F.2d 1251, 1254 (5th Cir. 1983) (quoting *Canadian Pac. (Bermuda) Ltd. v. United States*, 534 F.2d 1165, 1168 (5th Cir. 1976)); *see* 46 U.S.C. §§ 30903(a), 31102(a)(1), 31103.

[37] *See In re Great Lakes*, 624 F.3d at 211.

[38] *Id.* (quoting *Consol. Aluminum Corp.*, 883 F.2d at 67).

negligence was not foreseeable, then the United States owed no duty to Cervantes and is not liable as a matter of law.

In the context of maritime torts,[39] we have deemed harm to be a foreseeable consequence of an act or omission "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention."[40] This definition of foreseeability is in terms of *general* forms of harms and *general* classes of victims. So, our analysis focuses on the general risk of collision—not on the particular collision between the Coast Guard vessel and Cervantes—and on the general class of individuals—not on Cervantes.[41] And, when we consider the probability of harm, we do so "in terms of the 'natural and probable' risks that a reasonable person would likely take into account in guiding her practical conduct."[42]

Here, the general sort of harm—a collision between a vessel and an individual swimming across the BSC—was not foreseeable. The BSC is "a high-traffic waterway, travelled day and night by various vessels from small fishing boats to large tankers."[43] Because the Coast Guard vessel's duty is equivalent to that of a private vessel in similar circumstances, Garcia must show that the private vessels that travel the BSC anticipated this general

---

[39] *See id.*; *In re Signal*, 579 F.3d 478; *Consol. Aluminum Corp.*, 883 F.2d 65; *Southern Nat. Gas Co.*, 711 F.2d 1251.

[40] *In re Great Lakes*, 624 F.3d at 211 (quoting *Consol. Aluminum Corp.*, 883 F.2d at 68).

[41] *See In re Signal*, 579 F.3d at 492.

[42] *Id.* at 491–92.

[43] *Ruiz-Hernandez*, 890 F.3d at 206.

kind of harm.[44] But Garcia provides no indication that any of these private vessels would reasonably anticipate a collision with a nighttime swimmer. Plus, "experience and common sense" weigh against the foreseeability of this general sort of harm.[45] The high-traffic nature of the BSC, compounded with its minimal lighting and absence of a speed limit, renders a nighttime crossing by a human not only dangerous, but also unforeseeable. Thus, a private vessel travelling at night in a high-traffic waterway would not reasonably anticipate encountering swimmers in the water. Accordingly, the presence of nighttime swimmers does not "guid[e] [the] practical conduct" of private vessels in the BSC.[46] Additionally, it bears emphasis that the harm involves individuals who are intentionally trying to avoid detection. Our caselaw on the foreseeability of harm in the maritime context has involved incidents between inanimate objects.[47] Of those cases, only *In re Signal* found that the harm was foreseeable, largely because the risk of danger was due to a discrete incident.[48] Here, because the harm involves individuals, rather than inanimate objects, it is far more difficult to foresee what an undocumented alien who is intentionally trying to avoid detection would do. For these reasons, the harm was not foreseeable.

Likewise, the general class of victims was not foreseeable. Here, the general class would be individuals swimming across the BSC. And,

---

[44] *See Southern Nat. Gas Co.*, 711 F.2d at 1254 (quoting *Canadian Pac. (Bermuda) Ltd.*, 534 F.2d at 1168).

[45] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[46] *In re Signal*, 579 F.3d at 492.

[47] *In re Signal* involved a collision between two moored vessels and a bridge after Hurricane Katrina. *Consolidated Aluminum Corp.* involved the negligent rupturing of an oil pipeline. *Southern Natural Gas Co.* involved a dredging company's negligently striking of a pipeline. *In re Great Lakes* involved a private company's dredging activities.

[48] *In re Signal*, 579 F.3d at 493.

No. 19-40718

importantly, this class of victims includes individuals purposefully attempting to avoid detection.[49] Undocumented aliens' intention to evade detection mitigates the foreseeability of harm: If individuals are actively trying to avoid detection, then they do not wish to be foreseeable. Moreover, the relevant probability for duty is the natural and probable risks a reasonable person would likely take into account in guiding practical conduct, and Garcia provides no indication that private vessels in the BSC were in the practice of altering their conduct to accommodate the remote probability of encountering nighttime swimmers. Again, Garcia provides no indication that any of the private vessels that travel the BSC would reasonably anticipate causing harm to nighttime swimmers who were trying to avoid detection. Because the harm of a vessel–swimmer collision was not foreseeable, the United States owed no duty to Cervantes and is not liable for the asserted negligence of the Coast Guard crew.

Garcia argues there were facts known to the Coast Guard that made the vessel–swimmer collision foreseeable. He offers as evidence testimony of several Coast Guard officials to show that the Coast Guard was aware—and had actual knowledge—that the entire BSC was used by undocumented aliens as a point of entry into the United States. However, as discussed below, the Coast Guard's awareness of undocumented alien crossings does not necessarily render the harm to Cervantes foreseeable.

First, Garcia cites the interview summary of Lieutenant Erica Kelly, relying on the statement that approximately two to four undocumented aliens

---

[49] Garcia asserts that Cervantes was avoiding "nearby patrol boats," and the district court observed that she was "trying to cross undetected." The coxswain of the vessel on the night of the incident, Brandon Rae, also testified that undocumented aliens crossing the BSC "don't want to be seen."

are apprehended by the Coast Guard each month in the BSC.[50] As an initial point, this evidence is inherently devoid of context since the interview summary lacks the questions to which Lieutenant Kelly was responding. Plus, while the interview summary may show that the Coast Guard knew that crossings occurred in the BSC, it also indicates that the Coast Guard did not have knowledge of how many crossings occur, where along the 17-mile-long BSC these crossings occur, with whom knowledge of these crossings was shared, and other important details that inform our foreseeability analysis.[51] And finally, Lieutenant Kelly's interview summary supports our holding that the Coast Guard does not owe a duty because Lieutenant Kelly indicated that private vessels in the BSC may not be aware of undocumented alien crossings:

> I'm not aware if there have been any Notices to Mariners saying this is a high traffic area for migrants. We provide some of that information to the facilities at working group meetings, but not for the shrimpers. I don't believe that anything has been given to the tug operators. We do not get much information, if any at all, from the commercial side on UDA activity.

The Coast Guard's knowledge cannot be attributed to private vessels. And, if private vessels do not possess knowledge of such crossings, it would not be foreseeable to these private vessels that undocumented aliens might swim across the BSC.

Garcia also cites the interview summary of Training Officer Portwood, who was told that the BSC's Shrimp Basin was a "point of entry"

---

[50] Lieutenant Kelly is the Chief of Intelligence at Sector Corpus Christi and collects and reports data on the BSC crossings.

[51] Garcia also relies on the interview summary's statement that the Coast Guard provided a weekly briefing about crossings. But the interview summary also indicates that "it is hard to determine who actually is listening to the brief."

into the United States and that "pretty much the entire BSC is known for crossings" to support his claim that the harm to Cervantes was foreseeable. And Garcia also relies on the interview summary of Lieutenant Michael Bell, who said that he was briefed that undocumented aliens use trash bags, floats, and other flotation devices. Again, this evidence indicates that the Coast Guard had knowledge obtained through secondhand Coast Guard briefings and intelligence reports, but not necessarily firsthand experience of seeing undocumented aliens swimming across the BSC.[52]

Garcia fares no better in establishing that the crew on the night of the incident had firsthand experience of seeing such crossings. To show actual knowledge by the crew, Garcia must either provide evidence that the crew had firsthand experience of actually seeing an individual in the water or that the crew had previously encountered someone swimming across the BSC at night. Garcia has not shown either. Instead, Garcia cites the testimony of the crew's coxswain, Brandon Rae, who agreed that there was an unspecified "probability" of nighttime swimmers in the BSC. Rae's testimony, when viewed in context, may demonstrate that he had knowledge of Coast Guard briefings and intelligence reports that crossings occurred along the entire 17-mile-long BSC. But Rae's testimony also confirms that he had no firsthand experience of seeing undocumented aliens swimming across the BSC. Garcia's argument that the crew had actual knowledge that would render harm to nighttime swimmers foreseeable therefore fails.[53]

---

[52] *See, e.g.*, *In re Great Lakes*, 624 F.3d at 210 (contrasting general and actual knowledge).

[53] Garcia also argues that the district court erred in citing our decision in *Republic of France v. United States*, 290 F.2d 395, 401 (5th Cir. 1961), which requires proof of actual knowledge. Garcia argues that *Republic of France* is "outdated and antiquated" and distinguishable from this case, but he overlooks that we have repeatedly reaffirmed *Republic*

No. 19-40718

Garcia's cited evidence demonstrates that the Coast Guard was aware that undocumented alien crossings occurred along the BSC, but this knowledge was of a general nature. The Coast Guard did not know (1) the exact number of crossings, (2) the exact location of crossings, or (3) the exact timing of crossings, among other relevant details. These details are significant for our foreseeability analysis. The entire BSC is 17 miles long and approximately 500 feet wide; the Coast Guard patrols of the BSC cover a route of approximately 34.2 miles.[54] This is a very large area to cover, which affects our foreseeability analysis. Our decision in *Lloyd's Leasing Ltd. v. Conoco* is instructive. There, after a ship's tanks cracked, crude oil spilled into the waters of the Gulf of Mexico and washed ashore approximately 70 miles west of the site of the ship's grounding; the claimants were individuals who suffered damages from oil tracked onto their premises by tourists and beachgoers.[55] We held that the harm suffered by the plaintiffs was not foreseeable, emphasizing that the original oil spill occurred 70 miles away.[56] Because the oil spill had to wash ashore on a developed shore to create these damages of tracking oil, we noted that the amount of developed shoreline was a small percentage of the total coastline (60 miles out of 340 miles).[57] We ultimately held that, "[w]hile the appellee might reasonably anticipate that the oil would probably wash ashore somewhere, it had no reason to have anticipated that the oil would probably wash ashore in a heavily populated

---

*of France*'s actual knowledge requirement multiple times. *See, e.g.*, *In re Great Lakes*, 624 F.3d at 211–12; *Consol. Aluminum Corp.*, 833 F.2d at 68.

[54] *United States v. Ruiz-Hernandez*, 890 F.3d 202, 206 (5th Cir. 2018).

[55] *Id.* at 1449.

[56] *Id.*

[57] *Id.*

No. 19-40718

area and then be tracked into businesses and homes."[58] Similarly, the cited evidence here may show that the Coast Guard might reasonably have anticipated encountering undocumented aliens somewhere in the BSC, but the Coast Guard did not have knowledge to anticipate where exactly in the BSC the undocumented aliens would be swimming.

Garcia also relies on our opinion in *United States v. Ruiz-Hernandez* to argue that the swimmer vessel collision was foreseeable. However, in *Ruiz-Hernandez*, we discussed foreseeability from the perspective of Ruiz-Hernandez: We held that it was foreseeable from a *swimmer's* perspective that vessels would be traveling through the BSC.[59] But our holding there has little bearing on our duty analysis here because we must analyze foreseeability from the perspective of a *vessel* traveling through the BSC at night. Garcia also relies on *Ruiz-Hernandez* to argue that we should disregard the *manner* in which the harm occurred for purposes of determining foreseeability.[60] But the circumstances here—swimming at night in a high-traffic waterway that has minimal lighting and no speed limit—are relevant and bear upon the existence of an actionable duty.

Garcia also argues that the Coast Guard owes a special duty to undocumented aliens swimming across the BSC. He first argues there should be a duty because the purpose of BSC law-enforcement patrols is to search for, detect, and intercept undocumented aliens. But the specific functions that the Coast Guard performs has no bearing on the duty

---

[58] *Id.*

[59] 890 F.3d at 211 (holding "it was reasonably foreseeable that a person swimming across a high-traffic ship channel in the dark of night would be struck by a passing ship").

[60] *Id.* (the "precise nature of the [resulting] injury and the manner of its infliction is immaterial . . . , so long as the injury is of a type that, in the circumstances, might reasonably have been expected to occur").

determination because the duty owed, if any, is equal to that owed by private vessels, which do not perform such functions. Garcia also argues that the Coast Guard owes a duty to operate its vessels in a safe manner because its mission includes person-in-the-water recoveries. But the Coast Guard's safety responsibilities do not impose a special duty: Its duty is limited to ensuring the general safety of maritime facilities and commercial and recreational vessels in the BSC and in conducting search and rescue missions. And there is no evidence that the crew was undertaking a search and rescue as to Cervantes or otherwise providing rescue services in a manner that would impose a special duty.[61] In the absence of a special duty, the Coast Guard's duty is measured in accord with what all private vessels must do. Therefore, we hold that the Coast Guard did not owe a duty to Cervantes. Accordingly, the dismissal of Garcia's negligence claim against the United States for failure to state a prima facie case was proper.

B

Next, we address Garcia's products liability claims. Garcia brought defective design and failure-to-warn claims against Safe Boats and Mercury Marine under a theory of strict products liability.

Essentially, Garcia asserts two design defects: (1) the design of Safe Boats' vessel impaired the vessel-operator's forward visibility; and (2) the design of Mercury Marine's outboard engine lacked propeller guards. Garcia's failure-to-warn claims relate to these two asserted product defects. The district court dismissed the defective design claims against Safe Boats and Mercury Marine because, applying Restatement (Second) of Torts

---

[61] *See Allen v. Walmart Stores, LLC*, 907 F.3d 170, 181 (5th Cir. 2018) (noting that Texas courts "have recognized that a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation") (citation omitted).

§ 402A, it found that Cervantes was neither a user nor a consumer and thus lacked standing to bring maritime products liability claims under the defective design theory. And the district court dismissed the failure-to-warn claims because any duty to warn would be owed to the United States, not Cervantes.

Garcia raises several arguments regarding the dismissal of these claims. First, he argues that the district court incorrectly construed his products liability claims as brought against the United States. Next, he argues the district court erred in dismissing his products liability claims because it should have applied Restatement (Third) of Torts, not Restatement (Second) of Torts. Finally, Garcia argues that Safe Boats was not entitled to immunity based on the government contractor defense.

We address each argument in turn.

1

Garcia first argues that the district court erred in adopting the magistrate's R&R in its entirety because it incorrectly construed the products liability claims as brought against the United States. Admittedly, the magistrate judge incorrectly characterized Garcia's products liability claims as claims brought against the United States, not Safe Boats and Mercury Marine. However, the district court did not do so: In its order, the district court correctly viewed the products liability claims as against Safe Boats and Mercury Marine. Plus, all parties agree that Garcia's products liability claims are against Safe Boats and Mercury Marine, not the United States. This argument thus fails.

2

We next address Garcia's argument that the district court erred in applying Restatement (Second) of Torts § 402A. Under § 402A, the

No. 19-40718

"ultimate user or consumer" who is harmed by an allegedly defective product may bring suit against the seller of that product. [62] But a casual bystander may not.[63] Garcia does not dispute that Cervantes was properly characterized as a casual bystander. Instead, he argues that, for maritime products liability claims, we should apply Restatement (Third) of Torts § 1, which more broadly exposes sellers to liability for harm to individuals and under which Cervantes might have standing to bring products liability claims.[64]

We and the Supreme Court apply the Second Restatement to maritime products liability cases.[65] Garcia claims that we already recognize that the Third Restatement supplies the applicable substantive law for maritime products liability law, but he bases this on our single decision in *Krummel v. Bombardier Corp.*[66] There, the user of a watercraft broke his leg after his foot became trapped in the watercraft; he sued the manufacturer on defective design and failure-to-warn claims under Restatement (Third) of Torts § 2(b) and Louisiana Products Liability Act (LPLA).[67] The district

---

[62] RESTATEMENT (SECOND) OF TORTS § 402A (AM. LAW INST. 1965).

[63] *See id.* § 402A cmt. o (Courts "have not gone beyond allowing recovery to users and consumers," and "[c]asual bystanders . . . have been denied recovery.").

[64] RESTATEMENT (THIRD) OF TORTS § 1 (AM. LAW INST. 1998).

[65] *See Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 979 (1997); *Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 538 (5th Cir. 1987).

[66] 206 F.3d 548 (5th Cir. 2000). Garcia relies on other cases from our sister circuits, but those cases are distinguishable because they did not address § 1 of the Third Restatement. *See, e.g.*, *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 860 n.2 (9th Cir. 2011) (discussing § 2 of the Third Restatement but declining to adopt the Third Restatement for all cases). Moreover, we are not bound by the decisions of our sister circuits. However, we are bound by the Supreme Court and our own caselaw, both of which apply § 402A of the Second Restatement.

[67] *Krummel*, 206 F.3d at 550–51.

court found the manufacturer liable.[68] But we reversed because the district court based liability solely on the fact that an injury occurred and failed to perform the risk-utility analysis, as required by both the LPLA and the Third Restatement.[69] *Krummel* is distinguishable from this case: It involved claims by the product's user, not a casual bystander like Cervantes. So we had no reason in *Krummel* to discuss *who* may bring suits in maritime products liability cases under § 1—the provision Garcia claims should apply here. Instead, when we actually have confronted the issue of who has standing to bring maritime products liability claims, we have applied § 402A of the Second Restatement.[70] Thus, under our precedent, the Second Restatement, not the Third, supplies the substantive law for determining standing in maritime products liability claims. And, to the extent that Garcia argues we should adopt the Third Restatement, we may not: "Under our rule of orderliness, we may not overrule a prior panel decision absent an intervening change in the law, such as a statutory amendment or a decision from either the Supreme Court or our en banc court."[71] The Restatement is neither.

Garcia also argues that we should apply Texas law, which permits bystanders to bring defective products liability claims.[72] But, in maritime cases, a federal court may only apply state law to "fill the gaps" of maritime

---

[68] *Id.* at 551.

[69] *Id.* at 552.

[70] *See, e.g.*, *Vickers*, 822 F.2d at 538.

[71] *Thompson v. Dallas City Attorney's Office*, 913 F.3d 464, 467 (5th Cir. 2019).

[72] *See Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex. 1969) (holding "recovery under the strict liability doctrine is not limited to users and consumers); *see also Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 257 (Tex. 1999) (reaffirming the holding in *Darryl*).

law.[73] Adopting Texas's broader standing for bystanders would be more than mere gap-filling: It would be a seismic shift in maritime law.[74]

Because § 402A of the Second Restatement supplies the substantive law in our circuit for maritime products liability claims, the district court correctly applied it to determine that Cervantes lacked standing to bring those claims. Therefore, the district court did not err in dismissing Garcia's defective design claims against Safe Boats and Mercury Marine.

3

Even assuming Garcia could bring these products liability claims, we have an additional reason to affirm the district court's dismissal: Garcia fails to show that the asserted defective products proximately caused Cervantes' death. Although the district court did not address proximate cause in its order, we may affirm the district court's dismissal on any ground supported by the record.[75] And the record amply supports a finding that Garcia failed to show that Safe Boats' and Mercury Marine's asserted defective products were the proximate cause of Cervantes' fatality.

As the moving parties, Safe Boats and Mercury Marine have the burden of "identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."[76] Since Garcia would ultimately bear the burden of proof on his products liability claims, Safe Boats

---

[73] *Exxon Corp. v. Chick Kam Choo*, 817 F.2d 307, 316–17 (5th Cir. 1987).

[74] *See also Yamaha*, 516 U.S. at 210 ("[I]n several contexts, [the Supreme Court] ha[s] recognized that vindication of maritime policies demanded uniform adherence to a federal rule of decision, with no leeway for variation or supplementation by state law.").

[75] *Gilbert v. Donahue*, 751 F.3d 303, 311 (5th Cir. 2014) (stating that "we may 'affirm on any ground supported by the record'" even if "neither the appellant nor the district court addressed the ground, so long as the argument was raised below").

[76] Fed. R. Civ. P. 56(a).

No. 19-40718

and Mercury Marine may satisfy their burden "by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim."[77] If they do so, the burden then shifts to Garcia to show that specific facts exist over which there is a genuine dispute.[78] But Garcia cannot rely on"[c]onclusory allegations, speculation, and unsubstantiated assertions" to make this showing.[79]

We begin with the relevant law: Maritime law incorporates products liability, including strict products liability.[80] And to prevail on his strict products liability claims, Garcia must show that (1) Safe Boats and Marine Mercury sold the products, (2) their products were unreasonably dangerous or defective when they left their control, (3) those defects caused Cervantes' injury, and (4) damages.[81]

We next turn to Safe Boats' and Mercury Marine's burden: They must demonstrate that the record is insufficient to establish causation for Garcia's products liability claims. Because Garcia asserts two design defects, we address the evidence for each. First, Garcia asserts that Safe Boats' vessel was defective because it had impaired forward visibility at the time of the incident. The uncontroverted evidence demonstrates that the vessel was

---

[77] *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).

[78] *Anderson*, 477 U.S. at 250.

[79] *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citation omitted).

[80] *East River S.S. Corp. v. Transamerica Delavel, Inc.*, 476 U.S. 858, 865 (1986). *See also Vickers*, 822 F.2d at 538.

[81] *Vickers*, 822 F.2d at 538–40; 1 Thomas J. Schoenbaum, Admiralty & Mar. Law § 5.13 (6th ed. 2019) (citing Restatement (Second) of Torts § 402A).

No. 19-40718

traveling more than 30 knots at the time of the impact.[82] And it is undisputed that, when the vessel travels at a speed greater than 30 knots, forward visibility is not reduced. So, whatever limitations may be present in the vessel's forward visibility at slower speeds, there is *no* impairment to the vessel's forward visibility when it is navigating in excess of 30 knots, as it was at the time of the incident. Because the vessel was travelling over 30 knots at the time of the incident, the asserted impaired visibility defect cannot be—and is not—the proximate cause of Cervantes' fatality. And Garcia fares no better with proving causation for the second asserted defect, the engines' lack of propeller guards. Based on the undisputed expert testimony, the force involved in the collision would have resulted in immediate death upon impact with the vessel *even with* propeller guards. So the alleged failure to include propeller guards on the engines cannot be—and is not—the proximate cause of Cervantes' fatality.

Since Safe Boats and Mercury Marine meet their burden, the burden shifts to Garcia. Garcia must show that specific facts exist over which there is a genuine dispute about proximate cause. Garcia fails to do so. He provides no evidence that Safe Boats' and Mercury Marine's allegedly defective products proximately caused the incident. Instead, Garcia complains that the vessel was travelling too fast. But this concerns the operation of the vessel, not its design. Garcia's experts concede that the alleged limitation of the

---

[82] Safe Boats' expert, naval architect Robert Taylor, stated in his declaration and opined in his report that, at the time of the incident, the vessel was traveling at a speed of approximately 32–33 knots (36.8–38 mph). The Coast Guard's investigative report confirms this speed.

Importantly, for the 30 seconds before the impact, the vessel was fully on plane and the vessel's driver had an unobstructed view to the potential location of Cervantes. Only during the last 2.2 seconds before the impact—when Cervantes would have been too near the vessel to be visible—was the driver's forward visibility obstructed.

No. 19-40718

vessel's forward visibility does not even come into play in this case.[83] Garcia's experts also concede that only if the vessel had been traveling at a slower speed at the time of impact would the propeller guards have eliminated Cervantes' injuries. Plus, the experts who evaluated the force involved in the collision testified that the force would have resulted in immediate death upon impact with the vessel, even with propeller guards.

Because Garcia fails to provide specific facts showing there is a genuine dispute about proximate causation, he fails to meet his burden on establishing proximate causation, so his products liability claims were properly dismissed by the district court.

4

Garcia also brought failure-to-warn claims against Safe Boats and Mercury Marine. The district court dismissed his failure-to-warn claims on the grounds that Safe Boats and Mercury Marine owed the duty to warn to the United States, not to Garcia; so, assuming there was a breach of that duty, only the United States could properly maintain negligent failure-to-warn claims against Safe Boats and Mercury Marine. Garcia does not contest that no duty to warn was owed to Cervantes—he even admits that Safe Boats' and Mercury Marine's duty was owed to the Coast Guard.

Garcia instead argues that the district court erred in treating his failure-to-warn claims as negligence, rather than strict liability, claims. In his second amended complaint, Garcia brings his failure-to-warn claim against

---

[83] Garcia's expert, Robert Swint, testified that the SPC-LE has "very good visibility up to about 10 [knots] and very good visibility at about 30 [knots]." He confirmed that an SPC-LE vessel would have *no* forward visibility issues at speeds above 30 knots. Similarly, CDI Engineering Solutions generated a report for the Coast Guard that concluded that, whatever limitations there may be on the vessel's forward visibility, they are *not* present when the vessel is traveling in excess of 30 knots.

Safe Boats under a strict liability theory. But Garcia also brought these claims under the alternative theory of negligence. Under the negligence theory, Garcia alleges Safe Boats and Mercury Marines were aware of the products' defects, had a duty to provide the Coast Guard with a post-sale warning and instructions, and breached that duty. The district court correctly applied the Second Restatement and found that any duty to warn was owed to the products' user (the United States), not to a bystander (Cervantes). "For the manufacturer of a product, the general duty of care includes a duty to warn when the manufacturer 'knows or has reason to know' that its product 'is or is likely to be dangerous for the use for which it is supplied' and the manufacturer 'has no reason to believe' that the product's users will realize that danger."[84] Because Safe Boats and Mercury Marines owed no duty to Cervantes, the district court correctly dismissed Garcia's negligence failure-to-warn claims.

Assessing Garcia's failure-to-warn claims under the alternative strict liability theory, Garcia's claims still warrant dismissal because he does not establish causation. To maintain a failure-to-warn claim in strict liability, Garcia must present evidence that the absence of adequate warnings caused Cervantes' injuries. As with his design defect claims, Garcia does not show how the presence of warnings about the design of Safe Boats' vessel or Mercury Marine's engines would have prevented Cervantes' fatality.[85] In the absence of a showing that the inadequate instructions or warnings caused

---

[84] *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 993 (2019) (quoting RESTATEMENT (SECOND) OF TORTS § 388).

[85] Garcia points to Restatement (Third) of Torts § 2(c) and relies on our decision in *Krummel*. 206 F.3d 548 (5th Cir. 2000). As stated earlier, *Krummel* is distinguishable, and we apply the Second Restatement for cases in maritime law.

No. 19-40718

Cervantes' fatality, Garcia's failure-to-warn claims were also properly dismissed.

5

Finally, Garcia argues that Safe Boats failed to bear its burden on the affirmative government contractor defense. But because we find that Safe Boats and Mercury Marine are not liable for either the design defect or the failure-to-warn claims, we need not address their government contractor defense.

C

Garcia also brought a gross negligence claim against Safe Boats and Mercury Marine, seeking exemplary damages. The district court did not explicitly address this gross negligence claim in its order, but it did dismiss all Garcia's "negligence-based claims." And because Garcia does not raise the gross negligence claim on appeal—and Mercury Marine and Safe Boats do not brief this claim—we do not address dismissal of this claim.

D

Finally, Garcia brought wrongful death claims against the United States, Safe Boats, and Mercury Marine, which the district court dismissed. Garcia argues that the district court erred in concluding there was no underlying tort to sustain his wrongful death claims.

Federal maritime law recognizes a wrongful death cause of action.[86] This extends to both negligence and strict products liability.[87] When a non-seafarer (someone other than a seaman or longshoreman) is killed within

---

[86] *See Moragne v. State Marine Lines, Inc.*, 398 U.S. 375, 409 (1970).

[87] *See Norfolk*, 532 U.S. at 814; Schoenbaum, Admiralty & Mar. Law § 8:3.

state waters, the remedies applicable under the general maritime law may be supplemented by state law remedies, including state statutory wrongful death and survival remedies.[88] To recover these damages, a plaintiff must prove that the circumstances of the death meet the requirements of the relevant state law.

Here, Texas's Wrongful Death Act is the relevant law.[89] The Act "applies only if the individual injured would have been entitled to bring an action for the injury if the individual had lived."[90] As discussed above, there are no claims that Cervantes would have been entitled to bring.

Garcia reiterates the arguments he makes for the other claims to assert that Cervantes would have been entitled to bring personal injury claims. His arguments fail because they are predicated on the assumption that the United States owed a duty to Cervantes and that Cervantes had standing to bring the products liability claims, both of which we rejected.

Accordingly, because Garcia has no sustainable claim against the United States, Safe Boats, and Mercury Marine, the district court did not err in dismissing his wrongful death claims.

## IV

For these reasons, we AFFIRM the district court's dismissal of Garcia's claims against the United States, Safe Boats, and Mercury Marine.

---

[88] *See Yamaha*, 516 U.S. at 216 (holding that damages available for the jet ski death of an individual were governed by state law).

[89] Tex. Civ. Prac. & Rem. § 71.002 *et seq.*

[90] *Id.* § 71.003(a).